# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STANLEY PAUL, ADMINISTRATOR OF
THE ESTATE OF CHRISTOPHER
STANLEY PAUL, deceased,

       Plaintiff,

       v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 14-1382

## OPINION

CONTI, Chief District Judge

## I.   INTRODUCTION

This insurance coverage case was brought by plaintiff Stanley Paul, as Administrator of the Estate of Christopher Stanley Paul, deceased ("Plaintiff"), against defendant State Farm Mutual Automobile Insurance Company ("State Farm"). The underlying incident involved a September 12, 2010 accident in which Stanley Paul's son, Christopher Paul ("Christopher"), was hit by an intoxicated underinsured motorist and injured while Christopher was lawfully walking across a street in the South Side of Pittsburgh, Pennsylvania.

Christopher initially sought Medical Payments Coverage ("MPC"). After the medical benefits limit was reached, he notified State Farm that he was making a claim for underinsured motorist coverage ("UIM") under a policy issued by State Farm. It is the UIM claim investigation that led to the instant lawsuit. Christopher died of an accidental heroin overdose on March 6, 2013, and a significant aspect of Plaintiff's lawsuit, which was not raised until after Christopher's death, is whether the injuries Christopher suffered as a result of the accident were a

substantial contributing factor to his later drug use and eventual death. Plaintiff initially filed a complaint in the Court of Common Pleas of Allegheny County, Pennsylvania on September 9, 2014, alleging breach of contract and bad faith in violation of the Pennsylvania Bad Faith statute, 42 Pa. Cons. Stat. § 8371. State Farm timely removed the case to this court on October 13, 2014, based upon diversity of the parties. ECF No. 1. State Farm filed an amended answer denying liability and raising as an affirmative defense the "Concealment or Fraud" provision of the insurance policy, alleging that Plaintiff's claims are barred due to Christopher and his counsel intentionally mispresenting or concealing material facts. ECF No. 32. Pending before the court are the parties' cross-motions for summary judgment. ECF Nos. 70 & 75.[1]

Plaintiff seeks summary judgment on both of his claims. Plaintiff filed a brief in support of his motion (ECF No. 71), a concise statement of material facts (ECF No. 72), two appendices (ECF Nos. 73 & 74), a reply to State Farm's brief in opposition (ECF No. 108), a reply to State Farm's counterstatement of facts (ECF No. 107), and a supplemental appendix (ECF No. 109). In response to the motion, State Farm filed a response in opposition (ECF No. 83), a brief in opposition (ECF No. 84), a counterstatement of facts (ECF No. 85), and an appendix (ECF No. 86).

State Farm also seeks summary judgment, arguing that Plaintiff is barred from recovery in several ways, with its primary argument being that Christopher concealed material information from State Farm. State Farm filed a brief in support of its motion, (ECF No. 76), a concise statement of material facts (ECF No. 77), an appendix (ECF No. 78), and a reply to Plaintiff's brief in opposition (ECF No. 110). In response to State Farm's motion, Plaintiff filed

---

[1] This case was assigned to Senior District Judge Maurice B. Cohill, Jr., who assumed inactive status on August 1, 2016. On August 10, 2016, this case was reassigned to Chief Judge Joy Flowers Conti.

a response in opposition (ECF Nos. 81 & 106), a brief in opposition (ECF No. 80), a responsive concise statement of material of facts (ECF No. 82), several appendices (ECF Nos. 86-88; 104-105), and numerous exhibits (ECF Nos. 89-103).

This matter is fully briefed and ripe for disposition. As more fully explained below, both motions for summary judgment will be denied.

## II.  FACTUAL BACKGROUND

All material facts set forth below are undisputed unless otherwise indicated. Additional material facts may be discussed elsewhere in this memorandum opinion, in context. The evidence of record in this case is voluminous and the parties filed multiple duplicate documents in their appendices. The court will cite to the underlying record evidence rather than the parties' convoluted and argumentative concise statements and counterstatements of fact. In determining the material facts in this case, all reasonable inferences are drawn in favor of the nonmoving party. Inferences based upon speculation or conjecture, however, do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

The evidence in this case spans approximately five years since the time of the accident, and includes Christopher's medical and educational records prior to the accident. Plaintiff filed the instant action while State Farm's investigation and discovery efforts were ongoing in the underinsured motorist claim in order to not run afoul of the statute of limitations period. A review of the evidence shows that the insurance-related factual background falls into definable time periods of activity between the parties, with several significant gaps where the evidence shows little or no activity occurred.

The first time period begins with the accident and covers Christopher's medical treatment through December 2010, his MPC claim, and ends with his notifying State Farm that he was making an uninsured motorist claim under the policy. A ten-month gap in meaningful insurance-related activity occurred from January 18, 2011, through November 8, 2011, the date on which Christopher's counsel, Louis Tarasi, Jr, Esquire ("Attorney Tarasi"), provided numerous medical documents to State Farm and demanded the stacked limits of the insurance policy of $400,000.00.

The second time period concerns the UIM claim investigation conducted by State Farm and its outside counsel, Lori Mendicino, Esquire ("Attorney Mendicino"), and consists of the time from December 2011, through February 27, 2013, which is the date of the last letter sent by Attorney Mendicino. An eleven-month gap in insurance-related activity between the parties commenced on February 28, 2013, and lasted until State Farm's new counsel, Kathleen Segmiller, Esquire ("Attorney Segmiller"), corresponds with Attorney Tarasi on January 22, 2014, and February 27, 2014, regarding the UIM claim. A five-month gap in activity followed beginning February 28, 2014, and ending on July 25, 2014, when Attorney Tarasi notified State Farm that he received an expert report linking Christopher's heroin use and accidental overdose to the accident. The parties continued with the UIM claim investigation and related discovery, with discovery continuing during the course of the instant action. Besides the above-mentioned time periods of activity between the insured and insurer, there is record evidence regarding Christopher's medical treatment and his other activities, as well as evidence of State Farm's internal communications regarding the Christopher's claim.

**A. The September 12, 2010 Accident through Request for Policy Limits**

On September 12, 2010, at approximately 1:40 A.M., Christopher was hit by an automobile and knocked to the ground while attempting to cross the road on foot at the intersection of East Carson Street and 22nd Street in the South Side section of Pittsburgh, Pennsylvania. The vehicle was operated by Jason Douglas who was under the age of 21 and who was intoxicated. The evidence confirms that there is no dispute that Mr. Douglas was at fault for the accident and full liability for the accident lies with him.

**1. MPC Claim**

Christopher's parents, Stanley and Valerie Paul, are the owners of a State Farm Mutual Automobile Insurance Policy (the "Policy"), No. 052 0855-A02-38J, with an address at 211 Grandview Avenue, Pittsburgh, Pennsylvania. ECF No. 73-1. On September 13, 2010, Stanley Paul reported the accident to his State Farm agent. State Farm Auto Claim File Note ("Claim File Note"), Sept. 13, 2010, 9:50:28 A.M. ECF No. 73-2. The MPC claim was assigned to a State Farm claims representative, Janice Kenee, on September 13, 2010. Ms. Kenee made a note in the Claim File indicating that Christopher was no longer a household resident at the address of the Policy, and instead lived at 3129 Mary Street, Pittsburgh, P 15203. Claim File Note, Sept. 13, 2010, 11:41:15 A.M. She telephoned Christopher about the claim the same day. Claim File Note, Sept. 13, 2010, 11:48:04 A.M. Christopher told her that he was renting a house with three non-related roommates at the Mary Street address, named Matt, Mike, and Garrett, and that he had moved in a few weeks ago. Id.; Janice Kenee Dep. 25, July 29, 2015, ECF No. 74-22. Ms. Kenee reported that she explained to Christopher "priority of benefits and that he would not

qualify for his medical coverage – he would need to go to the striking vehicle." Claim File Note, Sept. 13, 2010, 11:48:04 A.M.; Kenee Dep. 24.

Ms. Kenee next contacted the State Farm agent who issued the Policy, who told her that it was that office's understanding that Christopher was in school, and therefore that he would be covered under the Policy. Claim File Note, Sept. 13, 2010, 11:48:04 A.M. Ms. Kenee immediately telephoned Christopher to clarify his school status but he did not answer, so she left a message. Id. Christopher did not respond to the message and Ms. Kenee left him another message on September 15, 2010. Claim File Note, Sept. 15, 2010, 3:00:47 PM. Again, Christopher did not respond to Ms. Kenee's message and she sent a contact letter to either Christopher or his father on September 17, 2010. Claim File Note, Sept. 17, 2010, 10:18:43 A.M.

On September 21, 2010, Stanley Paul confirmed to Ms. Kenee that Christopher was a full time senior at the University of Pittsburgh, having moved to the Mary Street address a few weeks prior to the accident. Claim File Note, Sept. 21, 2010, 3:45:00 PM; Kenee Dep. 25. He further confirmed that Christopher lived at home in the summer and is a dependent on the family's health insurance. Id. Ms. Kenee reported that she called the University of Pittsburgh and confirmed that Christopher was enrolled as a full time student. Id. Ms. Kenee recommended that Christopher be qualified for insurance coverage based upon his residency at his parents' house and his status as a full time student. Id. State Farm team manager Joe DiGaetano agreed with Ms. Kenee's recommendation to extend eligibility for coverage to Christopher in light of his dual residency. Claim File Note, Sept. 22, 2010, 7:46:40 PM. On October 29, 2010, it was noted that Christopher's medical benefit limit of $10,000.00 was exhausted. Claim File Note,

Oct. 29, 2010, 9:55:08 A.M.

On December 14, 2010, Attorney Tarasi notified Ms. Kenee that he was making a claim on behalf of Christopher for UIM under the State Farm Policy. Letter from Louis Tarasi to Janice Kenee, Dec. 14, 2010, ECF No. 78-3 at 18. He advised that the "tortfeasor had a policy of insurance which had a total limit of $15,000 in coverage." Id. He also requested "a complete copy of the policy of insurance issued to Stanley and Valerie Paul which was in effect on the date of the accident, including all endorsements and/or amendments to the same." Id.

State Farm closed the MPC claim on December 16, 2010. Claim File Note, Dec. 16, 2010, 9:12:08 A.M. & 9:17:31 A.M. State Farm opened an underinsured motorist claim on December 21, 2010, and set a reserve amount of $30,000.00. Claim File Note, Dec. 21, 2010, 4:06:21 P.M. & State Farm Auto Claim File Financial Information, at 1, Sept. 9, 2014, ECF No. 73-2 at 2. The UIM claim was assigned to State Farm claim representative Michael Grove. Mr. Grove contacted Attorney Tarasi by letter dated December 22, 2010, stating in relevant part:

> This will acknowledge receipt of your letter dated December 14, 2010. Please be advised that I have been assigned the handling of our insured's Underinsured Motorist claim. . . .
>
> In order to proceed with the UIM claim, please forward the following:
>
> - Copy of the police report.
> - Documentation confirming the liability limits of the tort-feasor. You advised in your letter that the reported liability limit is $15,000.
> - Copy of complete medical records.
> - Written permission in order to view the first-party medical file [MPC claim] which was handled by a separate adjuster [Ms. Kenee].
>
> I will forward a certified copy of our insured's policy once it is received from our Underwriting Department. Our insured carries UIM Coverage in the amount of $100,000 per person.

Letter from Michael Grove to Louis Tarasi, Dec. 22, 2010, ECF No. 78-3 at 19.

Attorney Tarasi responded to Mr. Grove's request for materials on January 18, 2011. He provided the police crash report and documentation from Progressive Insurance, the tortfeasor's insurance company, confirming that the liability limits were $15,000. Letter from Tarasi to Grove, Jan. 18, 2011, ECF No. 73-3. He noted that Progressive Insurance offered the policy limit of $15,000 to settle the claim, and Attorney Tarasi requested that State Farm provide its written consent to the settlement. Id. Attorney Tarasi did not provide any medical records at this time, or a written consent from Christopher with respect to State Farm's MPC claim.[2]

Thereafter, between March and September, 2011, Mr. Grove sent six status letters to Attorney Tarasi inquiring if he was ready to engage in settlement discussions and to please provide any updated information related to the claim. Letters from Grove to Tarasi, dated Mar. 18, 2011, Apr. 27, 2011, June 16, 2011, Aug. 3, 2011, & Sept.21, 2011; Claim File Notes, dated Mar. 18, 2011, Apr. 27, 2011, June 16, 2011, Aug. 3, 2011, Sept.21, 2011, and Nov. 9, 2011 (ECF No. 78-3 at 30-37). Attorney Tarasi did not respond to the letters until November 8, 2011, at which time he provided numerous medical documents and requested to settle the claim for the policy limits, which he believed to be $400,000.00.[3] Letter from Tarasi to Grove, Nov. 8, 2011, ECF No. 73-6.

## 2. Medical Treatment through December 2010

Christopher was knocked to the ground by the automobile that hit him causing the left

---

[2] State Farm had an internal policy that prohibited a UIM claim representative from accessing an insured's MPC claim file without written consent, even though both claims were filed by the same insured under one policy and one accident. During the course of the claim investigation State Farm apparently abandoned its policy. Plaintiff submits that State Farm never explained its internal policy when requesting written consent and Plaintiff's failure to provide written consent for State Farm to access State Farm's own MPC file was ultimately harmless.

[3] The status letter dated November 9, 2011, was mailed after Attorney Tarasi had already sent his November 8, 2011 letter demanding the stacked policy limits.

side of his head to hit the road.  A City of Pittsburgh EMS ambulance arrived on the scene at approximately 1:45 A.M.  City of Pittsburgh EMS Report, Sept. 12, 2010, ECF No. 88 at 3-5. The EMS Report indicated that Christopher's chief complaint was hematoma to head and his secondary complaint was amnesia.  Id.  Christopher "could not remember what happened even after he was told about the incident" and it was reported that he had a "large hematoma to the left side of his forehead."  Id.  The ambulance transported Christopher to UPMC Mercy Hospital where a Level 2 trauma team was requested.  Id.

UPMC Mercy Hospital medical records report that Christopher presented as a level 2 trauma patient who recalls walking on the South Side and then waking up on the ground, but that he does not recall the incident.  UPMC Mercy Hospital Emergency Department Evaluation Record, at 2, Sept. 12, 2010, ECF No. 88 at 8-43.  A CT scan of his head was performed, the results of which indicted a large left frontal subgaleal hematoma without acute intracranial pathology, without fracture, and without intracranial hemorrhage.  UPMC Mercy Hospital Radiology Report, Sept. 12, 2010.  A CT scan of his back and X-rays of his chest, left knee, and pelvis were essentially normal, with none of the X-rays revealing any fractures.  UPMC Mercy Hospital Radiology Reports, Sept. 12, 2010

Christopher was seen for follow-up care by his primary care physician, Daniel J. Monahan, M.D., on September 16, 2010.  Dr. Monahan's September 16, 2010 office note stated in part:

> [Christopher] was walking across the street and was hit in his left leg and knee by a car that was traveling very fast. He had a direct head injury on the left side of his temple and had complete loss of consciousness. He has no memory of getting hit, does not remember being lying on the ground, does not remember ambulance transfer, does not remember being initially in the emergency room, getting a CAT scan, but does remember waking up.

Monahan Office Note, Sept. 16, 2010, ECF No. 89 at 18.  Dr. Monahan noted that Christopher has had a headache, swelling of his left eye, and mild to moderate pain in his left knee.  Id.  In his "Assessment and Plan" Dr. Monahan noted a medial collateral ligament strain in Christopher's left knee and a concussion.  Id.  He recommended ice and nonsteroidal medicine for his knee pain and to follow up if the pain does not resolve.  Id.  For the concussion he recommended that Christopher take it easy academically for the next week or so and to follow up with the concussion center.  Id.[4]  Dr. Monahan also noted that he talked with Christopher "at great length and in detail" about his concussion.  Id.

In support of his recommendation that Christopher take it easy academically, Dr. Monahan authored a letter stating that Christopher "sustained a significant concussion," and that "he may need extra time for homework and may need to delay taking tests for the next 3 weeks." Letter from Daniel J. Monahan, Sept. 16, 2010, ECF No. 89 at 22.

The same date, September 16, 2010, Christopher was seen by an orthopedist, James P. Bradley, M.D. for his left knee pain.  Dr. Bradley assessed Christopher with a grade II sprain or tear and noted a "questionable medial meniscus tear underlying the MCL tear."  Burke and Bradley Orthopaedics Medical Record, at 2, Sept. 16, 2010, ECF No. 89 at 25-35.  X-rays of the knee and leg were taken showing no fractures.  Id.  An MRI of the left knee was scheduled and Christopher was given an MCL stabilizing brace that he was to wear at all times.  Id.  An addendum to the report was added indicating that because of the concussion at the time of

---

[4] In the September 16, 2010 office note, Dr. Monahan reported that Christopher "notes that he boxes and has been training for a while," and he had a "strong desire to get back to boxing," and that despite Dr. Monahan's warnings Christopher "insisted on boxing again."  Monahan Office Note, Sept. 16, 2010, ECF No. 89 at 18.  There is no evidence to support that Christopher engaged in contact boxing against another person either before or after the accident.  The evidence supports that Christopher engaged in exercises based on boxing and may at some time had a desire to try boxing but never did.

impact, Christopher was referred to Dr. Michael Collins for evaluation for impact testing at the Sports Medicine Clinic. Id. at 3.

Christopher returned to Dr. Bradley on September 21, 2010, at which time Dr. Bradley reported that the MRI showed a grade II tear of the MCL with bone bruises present laterally. Burke and Bradley Orthopaedics Medical Record, at 1-2, Sept. 21, 2010, ECF No. 89 at 29-30. Dr. Bradley prescribed physical therapy for Christopher. Id. Christopher successfully underwent physical therapy at the Centers for Rehab Services beginning on September 22, 2010, and ending on October 12, 2010. Centers for Rehab Services Records, Sept. 22, 2010 to Oct. 12, 2010, ECF No. 90 at 17-36. Christopher returned to Dr. Bradley on November 16, 2010, at which time Dr. Bradley's diagnosis was "Healed grade II MCL sprain of the left knee" and that a "slight  opening" with a "palpable click" will likely be present for the remainder of his life" but it is "intact" and should not be a problem. Burke and Bradley Orthopaedics Medical Record, at 2, Nov. 16, 2010, ECF No. 89 at 33. Dr. Bradley remarked that Christopher could return to full sporting activities. Id.

On September 30, 2010, Christopher began treatment for his right wrist injury and associated pain with Robert Kaufmann, M.D., who reported to Dr. Monahan that he "thinks [Christopher] has a sprain, maybe a tear of the triangular fibrocartilage complex, which is the structure that connects the radius to the ulna, and he will wear [a] brace pretty much 23 hours and 55 minutes a day for the next month," along with taking Motrin. Letter from Robert Kaufmann to Daniel Monahan, Sept. 30, 2010, ECF No. 90 at 14. Dr. Kaufmann also noted that if it was a tear that surgery may be required. Id. When the pain proved to be essentially unchanged at the next visit on November 2, 2010, Dr. Kaufmann believed that there was a tear of

the triangular fibrocartilage complex and ordered an MRI of the wrist. Kaufmann Office Note, Nov. 2, 2010, ECF No. 90 at 43. On November 9, 2010, Dr. Kaufmann noted that Christopher was in "a great deal of pain," and that he "is really debilitated by this, and it has affected his life." Kaufmann Office Note, Nov. 9, 2010, ECF No. 90 at 44. The MRI did not show anything "that sticks out as a real problem", however, he thought Christopher "might have a tear that is just going undetected by the MRI." Id. He gave him an injection and requested that he return in two months. Id.[5]

Christopher was evaluated and treated at the UPMC Sports Concussion Program by neuropsychologist, Eric W. Johnson, Psy.D., on September 30, 2010, and again on November 26, 2010. ECF No. 91 at 12-20. At the September 30, 2010 evaluation Christopher reported acute symptoms from the accident as a seven out of ten severity level of "headache, bradyphrenia [slowness of thought], fatigue, attention/concentration difficulties as well as difficulty falling and staying asleep." Johnson Medical Record, at 1, Sept. 30, 2010, ECF No. 91 at 12. Dr. Johnson noted that Christopher had "improved significantly likely due to rest" and he presented "essentially asymptomatic." Id.

Mr. Johnson conducted an evaluation using ImPACT, a computerized measure of neurocognitive functioning designed to assess concussion and post-concussion symptoms using the Post-Concussion Symptoms Scale ("PCCS"). Id. No baseline testing was available and therefore Dr. Johnson compared Christopher's results to normative data, noting that his "scores are likely mildly below expected premorbid levels." Id. Verbal memory was in the borderline

---

[5] Christopher saw William Donaldson, M.D. for lower back pain, and after a comprehensive evaluation Dr. Donaldson diagnosed a muscular strain and assured Christopher that there was nothing serious, it should get better and he would benefit from physical therapy. Donaldson Medical Record, Nov. 2, 2010, at 1-2 ECF No. 91 at 8-9. Christopher's back pain is not a factor in this litigation.

range, visual memory and reaction time were in the average range, and visuomotor speed was in the high average range. Id. Based upon this evaluation Dr. Johnson reported his impression that Christopher had "made an excellent, albeit, incomplete recovery due to the concussion," and that "he is likely mildly below expected premorbid levels on neurocognitive functioning." Id. at 2. He recommended that Christopher remain out of activities that put him at greater risk of reinjury and he "explained the relationship between exertion and potential recurrent concussion symptoms." Id.

Christopher returned to Dr. Johnson on November 26, 2010, and again was evaluated using the ImPACT test and the PCSS. Johnson Medical Record, at 1, Nov. 26, 2010, ECF No. 91 at 14. Overall his scores improved, resulting in scores "within broad average ranges." Id. Christopher reported to Dr. Johnson that he had mild symptoms of headache approximately once per week that go away in approximately twenty minutes, and that the headaches arise when he is fatigued or if there is a lot of noise. Id. Dr. Johnson reported his impression that "["Christopher"] remains mildly asymptomatic and within broad normal limits on neurocognitive testing," but that he does not "feel he has fully recovered at this time." Id. Christopher told Dr. Johnson that he had withdrawn from the University of Pittsburgh but planned to return, and Dr. Johnson requested that Christopher come back to see him after he starts the semester to "insure that his symptoms/neurocognitive functioning are not significantly exacerbated with increased cognitive exertion." Id.

Dr. Johnson authored a one-page report regarding Christopher in which he explained:

Concussion injury usually involves a constellation of symptoms that include somatic symptoms (headache, fatigue, etc.) and neurocognitive symptoms (difficulty concentrating, difficulty remembering, bradyphrenia) due to associated changes in cerebral blood flow. Concussion is a neurometabolic injury which

usually has lingering effects including headache, vestibular issues, mood changes, and neurocognitive deficits. While most recover from these symptoms, it does take a period of time (often several months) and can be complicated by many factors such as having additional blows following the initial injury, amnesia (patient experienced approximately 30 to 60 minutes), continued physical exertion following the injury, continued cognitive exertion following the injury, sleep disruption, etc.

Johnson Report, Dec. 8, 2010, ECF No. 91 at 20. Dr. Johnson offered his opinion as follows:

Given Mr. Paul's subjective report; the clinical interview, and object results on neurocognitive testing, it is my opinion that he continues to experience residual symptoms from the event on 09/12/2010. From a neurocognitive standpoint, Mr. Paul has improved significantly over the last several months and test scores on 11/26/2010 range from average to superior. However, given the nature of his injury, increased exertion (cognitive and/or physical) may exacerbate his symptoms. Behavioral management, such as taking breaks and not pushing through his symptoms will likely help facilitate recovery. Though Mr. Paul may experience chronic symptoms due to postconcussion syndrome, prognosis is good at this time, to a reasonable degree of neuropsychological certainty, for full recovery over the next few months.

Id.

**B. UIM Claim Investigation and Later Medical Treatment**

The UIM claim was initiated in December 2010, but as stated above there was no significant insurance-related activity between the parties until Attorney Tarasi made a demand for the stacked policy limits of $400,000.00 on November 8, 2011. Letter from Tarasi to Grove, Nov. 8, 2011, ECF No. 73-6 at 2-6. Mr. Tarasi's November 8, 2011 letter included a review of the accident, a review of Christopher's medical treatment, his continuing symptomology, and the effect of the accident on his mental and physical health. Id. The letter reviews Christopher's medical treatment through December 2010, already summarized above. Attorney Tarasi added that "Mr. Paul's facial muscles were traumatized in the accident which affected his ability to eat anything other than soft or liquid food", that he lost 25 pounds, and had to purchase a new

wardrobe.  Id. at 3, ECF No. 73-6 at 4.

Attorney Tarasi indicated in the November 8, 2011 letter that Christopher was seen by an independent neuropsychologist, Rebecca M. Weigers, Ph.D., in October 2011 for neuropsychological testing and evaluation, and included her Report dated November 7, 2011.  Id. In addition to reviewing the City of Pittsburgh EMS report dated September 12, 2010, Ms. Weigers administered several neuropsychological tests to Christopher.  Weigers' Report, at 1-2. Nov. 7, 2011, ECF No. 90, at 2-7.  She found that he was "functioning within the high average range of intelligence," but that his superior verbal comprehension reflected "a probable higher level of intelligence prior to his development of Persistent Post-concussive Syndrome."  Id. at 2. She assessed his memory functioning as his "most significant neuropsychological impairment." Id. at 3.  She stated that Christopher had "impaired organization skills and working memory, as well as excessive impulsivity and difficulty sustaining attention."  Id. at 4.

After summarizing Dr. Weigers' results Attorney Tarasi stated in the November 8, 2011 letter that it is "Dr. Weigers' opinion based upon a reasonable degree of neuropsychological certainty that Christopher has persistent post concussive syndrome because of his significant difficulty sustaining both his visual-motor and auditory-verbal working memory, and with retention, particularly of visual input."  Letter from Tarasi to Grove, Nov. 8, 2011, at 3, ECF No. 73-6 at 4.  In addition to Dr. Weigers' report, Attorney Tarasi provided State Farm with the following documentation:

- City of Pittsburgh EMS report, 9/12/10;
- UPMC Mercy Hospital admission 9/12/10;
- Dr. Monahan's records, 9/15/10;
- Dr. Bradley's records, 9/30/10-11/9/10;
- Dr. Kaufmann's records, 9/30/10-11/9/10;
- Center for Sports Medicine records, 9/2810-10/12/10;

- Dr. Johnson's Report, 12/8/10; and
- A copy of the Consolidated Statement of Benefits from HealthCare Recoveries in regard to subrogation lien of UPMC Health Plan for $5,257.77.

Id. at 4-5.  Attorney Tarasi concluded his letter with the following demand:

> Christopher Paul has sustained severe, devastating injuries which will affect him for the rest of his life. I am demanding the stacked policy limits, which I understand to be $400,000.00, to settle this case.

Id. at 5.

## 1. UIM Claim Investigation under Attorney Mendicino

On November 17, 2011, State Farm claim representative Michael Grove reported that he told Attorney Tarasi that he would review the letter and supporting documents and let him know if additional discovery was needed.  Claim File Note, Nov. 17, 2011, 11:47:30 A.M., ECF No. 73-2 at 16-17.   The claim was referred to State Farm's Special Investigations Unit ("SIU"), apparently due to the medical "Specials" received from Attorney Tarasi.  Claim File Note, Nov. 17, 2011, 2:53:26 P.M., ECF No. 73-2 at 16.  However, this referral was "deleted" on November 22, 2011.  Claim File Note, Nov. 22, 2011, 1:50:56 P.M., ECF No. 73-2 at 14.  State Farm engaged Insight Investigations, Inc. to perform a Virtual Information Analysis on Christopher, which is an internet investigation of the subject.  Claim File Note, Nov. 21, 2011, 10:59 07 A.M., ECF No. 73-2 at 15.

In addition, State Farm made the decision to refer the claim to Attorney Mendicino in order "to secure Mr. Paul's Statement Under Oath ("SUO").  Letter from Grove to Tarasi, Nov. 20, 2011, ECF No. 78-5 at 30.  Mr. Grove stated that once counsel had reviewed the file, she would contact Attorney Tarasi to schedule the statement.  Id.; see also Claim File Note, Nov. 21, 2011, 9:59 20 A.M., ECF No. 73-2 at 15 (noting that Grove "called in case to D[efense]

A[ttorney]"). Mr. Grove orally informed Attorney Tarasi that State Farm was referring the claim to outside counsel in order to assist with discovery and obtain a statement under oath. Claim File Note, Nov. 21, 2011, 2:32:38 P.M., ECF No. 73-2 at 14-15. In Mr. Grove's summary of the telephone call he noted that Attorney Tarasi characterized Christopher as suffering "permanent brain damage," whereas Mr. Grove told Attorney Tarasi that permanent brain damage "is not supported" by the records, but that the records " indicate [Christopher] sustained concussion with post concussive symptoms." Id., ECF No. 73-2 at 15

A telephone conference was conducted on December 8, 2011, in which Mr. Grove, State Farm team manager Robert Mundy, and Attorney Mendicino participated. Claim File Note, 12/8/2011, 1:26:50 P.M., ECF No. 73-2 at 14. The redacted file note indicates that they agreed to secure Christopher's primary care physician's medical records for the past five years and records relating to Christopher's residency, including obtaining a copy of the apartment lease; and that they were waiting on the results of Insight Investigations virtual information analysis. Id.; see also Claim File Note, Mar. 22, 2012, 9:15:08 A.M., ECF No. 73-2 at 13 (noting that attorney was attempting to obtain last five years of PCP records and records related to residency, including a copy of the lease for the apartment).

On December 12, 2011, Attorney Mendicino served a set of ninety-six interrogatories and nineteen requests for production of documents on Attorney Tarasi. Letter from Mendicino to Tarasi, Dec. 12, 2011, ECF No. 78-6 at 3. In her letter transmitting the discovery requests, she set forth additional requests for information and documents that repeated, varied, or added to the formal discovery requests. Id. For example, in her letter she asked to be provided with Christopher's primary care physician's records for five years prior to the accident, but in request

17

for production of documents No. 17 she requested all prior medical records going back ten years. Id.; Request for Prod. Doc. ¶ 17, ECF No. 78-6 at 41. In the transmittal letter she requested medical records from the University of Pittsburgh regarding any treatment Christopher had received while he was a student. Letter from Mendicino to Tarasi, Dec. 12, 2011, ECF No. 78-6 at 3. She stated that upon receipt of the above-named documents she "would like to schedule the statement under oath of your client." Id. She set forth several additional requests as follows:

> We will also need all of your client's academic records from the University[6] as well as complete medical records with regard to his treatment at the Concussion Center, the ImPACT studies and the evaluation performed by Dr. Wiegers. Again we will need complete copies of any and all records and tests from these providers.

Id. Her letter goes on to repeat that upon receipt of "this information we will be in a position to proceed with the statement under oath." Id.

On January 6, 2012, Mr. Grove noted that Insight Investigations provided a report indicating that the only significant information uncovered was a March 25, 2011 court document that Christopher had been arrested for public drunkenness. Claim File Note, Jan. 6, 2012, 2:15:00 P.M.; Letter from Insight Investigations, Inc. to Grove, Dec. 27, 2011, ECF No. 105-4 at 2-8. Mr. Grove sent a copy of Insight Investigation's report to Attorney Mendicino by facsimile. Claim File Note, Jan. 6, 2012, 2:15:00 P.M., ECF No. 73-2 at 13.

Attorney Mendicino sent a letter to Attorney Tarasi inquiring about the status of responses on January 10, 2012. Letter from Mendicino to Tarasi, Jan. 10, 2012, ECF No. 86-9. Attorney Tarasi responded by letter dated January 11, 2012, explaining that he had not received the discovery requests until December 14, 2011, and that due to the holidays he had not yet completed the responses. Letter from Tarasi to Mendicino, Jan. 11, 2012, ECF No. 109-4 at 4.

---

[6] Attorney Mendicino did not request any academic records in the request for production of documents.

Attorney Mendicino sent another inquiry letter on March 15, 2012. Letter from Mendicino to

Tarasi, Mar. 15, 2012, ECF No. 86-9. On March 29, 2012, Attorney Tarasi served his discovery

responses on Attorney Mendicino. Letter from Tarasi to Mendicino, Mar. 29, 2012, ECF No.

78-6 at 4. In the response to the requests for production of documents, Attorney Tarasi provided

the following medical documents:

- City of Pittsburgh EMS report, 9/12/10;
- UPMC Mercy Hospital admission 9/12/10;
- Dr. Monahan's records, 9/15/10;
- Dr. Bradley's records, 9/30/10-11/9/10;
- Dr. Kaufmann's records, 9/30/10-11/9/10;
- Center for Rehab Services records, 9/28/10-10/12/10;
- Dr. Johnson's records and report, 12/8/10; and
- Dr. Weigers' Amended Report, 2/27/2012.

Resp. to Request for Prod. Doc. ¶2, ECF No. 73-8 at 2-14. All the above records, with the

exception of Dr. Weigers' amended report, had already been provided to Mr. Grove on

November 8, 2011. Dr. Weigers' Amended Report added the results from the Paced Auditory

Serial Addition Test ("PASAT") and she reported further conclusions consistent with her opinion

that Christopher suffered severe symptoms from persistent post-concussive syndrome. Weigers'

Nov. 7, 2011, Amended Feb. 27, 2012, ECF No. 90 at 9-14. Attorney Tarasi explained that he

had submitted a request for medical records from Christopher's family physician and that the

records would be provided upon receipt. Resp. to Request for Prod. Doc. ¶ 17, ECF No. 73-8 at

10.

Also provided by Attorney Tarasi were a copy of the Pittsburgh Police crash report, dated

September12, 2010; four photographs showing Christopher's injuries; various medical bills; a

State Farm declaration sheet; and a copy of Christopher's State Farm first-party benefits file and

documentation with respect to a subrogation lien.  Id. ¶¶ 4, 6, 10, 15, & 19, ECF No. 73-8 at 4, 5-6, 7, 9, & 11.

In his answers to interrogatories, Christopher stated that he lived at the Mary Street apartment while he was a student with three roommates named Matt Klimczyk, Garrett Shahene, and Brian Paschke.  Answers to Interrogatories ¶ 1(d), ECF No. 73-8 at 15-62.  He stated that he graduated from Fox Chapel Area High School in 2006 and from the University of Pittsburgh in May 2011.  Id. ¶ 3, ECF No. 73-8 at 18.  He stated that he was in good health prior to the accident, had not suffered from or received treatment for headaches before the accident, had no prior psychological or psychiatric treatment, had not been diagnosed as an alcoholic or drug addict, had no alcohol or drug abuse treatment or counseling, had to drop out from the University of Pittsburgh in the fall of 2010 as a result of his injuries, and had never been convicted of a crime of *crimen falsi*.  Id. ¶¶ 31, 37, 44, 52, 53, 64, & 96, ECF No. 73-8 at 31, 33, 37, 41, 46-47, & 58-59.

After receiving the discovery responses, Attorney Mendicino reported to Mr. Grove that in Attorney Tarasi's responses he did not provide school records, medical authorizations for Christopher's prior primary care physician's records, and other unnamed material.  Claim File Note, Apr. 12, 2012, 1:17:26 P.M., ECF No. 73-2 at 12; see also Claim File Note, Apr. 28, 2012, 1:58:52 P.M., ECF No. 73-2 at 12 (Mr. Grove reviewed a letter from Attorney Mendicino summarizing discovery responses in which Attorney Mendicino noted that the responses did not include the five-year prior medical history, medical and academic records from school, impact testing and analysis records, and other unnamed material).  As noted above, Attorney Mendicino did not request academic records from Attorney Tarasi in her requests for production of

documents. Although Attorney Tarasi did not provide authorizations for the medical records, he explained that he had requested medical records from Dr. Monahan, which would be provided upon receipt. Resp. to Request for Prod. Doc. ¶ 17, ECF No. 73-8 at 10.

Attorney Mendicino acknowledged receipt of the discovery responses in a letter to Attorney Tarasi, indicating to him that she would like to schedule the statement under oath "in the interim" while awaiting for Dr. Monahan's records. Letter from Mendicino to Tarasi, Apr. 16, 2012, ECF No. 78-6 at 5. She referred to her December 12, 2011 transmittal letter in which she served the discovery responses requesting, without specificity, that "I am going to need to obtain the records in my letter of December 12, 2011." Id. Attorney Tarasi responded to Attorney Mendicino by stating that she should contact his legal assistant to arrange a date for the statement under oath, he would forward Dr. Monahan's records as soon as he receives them, and he will obtain Christopher's academic records from the University of Pittsburgh. Letter from Tarasi to Mendicino, May 2, 2012, ECF No. 104-8 at 38. He noted that he believed he had already provided complete medical records regarding Christopher's treatment at the Concussion Center. Id. Finally, he explained his position that the "ImPACT studies and other testing records from the Concussion Center and Dr. Weigers are confidential and cannot be released to laypersons." Id.

Attorney Mendicino sent a follow-up letter to Attorney Tarasi on May 31, 2012, seeking dates in June and July 2012 to schedule the statement under oath. Letter from Mendicino to Tarasi, May 31, 2012, ECF No. 104-8 at 29. On June 13, 2012, she confirmed that the statement under oath was scheduled for July 30, 2012 at 10:00 A.M., but qualified that she wanted Dr. Monahan's records prior to the statement. Letter from Mendicino to Tarasi, June 13, 2012, ECF

No. 78-6 at 6.  She stated that she would like Christopher's University of Pittsburgh academic records prior to the statement.  Id.  Finally, she stated her disagreement with Attorney Tarasi's objection regarding her request for "ImPACT studies and other testing records from the Concussion Center and Dr. Weigers."  Id.  She explained as follows:

> These [records] will be necessary for an ultimate independent medical examination if necessary.  To the extent that he is making a claim for a head injury, these records are not confidential and must be produced.

Id.

On July 19, 2012, Attorney Tarasi provided a copy of Dr. Monahan's records and Christopher's undergraduate transcript.  Letter from Tarasi to Mendicino, July 19, 2012, ECF No. 78-6 at 7.  He reiterated his position that ImPACT studies and other testing records from the Concussion Center and Dr. Weigers are confidential, further explaining that "[r]ecords of this nature can only be released directly to other physicians and not laypersons."  Id.

On July 13, 2012, Christopher filed an action in the Court of Common Pleas of Allegheny County asserting negligence claims against certain entities believed to have served alcohol to the underage tortfeasor, as well as asserting a bad faith claim against State Farm.  Paul v. H&R Brothers, LLC, No. GD 12-12068, Court of Common Pleas of Allegheny County, July 13, 2012.  Attorney Mendicino was listed as counsel of record for State Farm in defense of this action; however, State Farm hired two additional attorneys from a different law firm to represent it in the state court action.  The filing of the state court lawsuit delayed scheduling the statement under oath.  The parties first attempted to seek a stay of the action, but ultimately Attorney Tarasi agreed to dismiss the lawsuit against State Farm without prejudice.

Attorney Mendicino sought and received assurances from Attorney Tarasi that he would not be filing another lawsuit against State Farm so that the parties could continue to seek resolution of the UIM claim.  Letter from Tarasi to Mendicino, Oct. 24, 2012, ECF No. 74-2. Attorney Tarasi provided Attorney Mendicino with Christopher's prior medical records from Dr. Monahan dated from August 10, 2005 through August 5, 2009.  Id.  He explained that the delay in providing the records was due to the fact that Dr. Monahan's office had to retrieve the records from storage.  Id.

On October 31, 2012, Attorney Mendicino wrote to Attorney Tarasi to request information that she said was needed in order to "determine whether an ultimate examination will be required."  Letter from Mendicino to Tarasi, Oct. 31, 2012, ECF No. 74-3.  She stated her requests as follows:

> I had requested all of the lease documents with regard to Mr. Paul's apartment in the Southside during the term of that lease.
>
> I had also requested all of the records from the University as well as all of the ImPACT studies and records pertaining to the claim of concussion.

Id.  In response, Attorney Tarasi accurately pointed out that there is "no record of any prior request from you for a copy of the lease documents," but that Christopher would attempt to obtain a copy.  Letter from Tarasi to Mendicino, Nov. 6, 2012, ECF No. 95 at 38.  He stated that he would attempt to obtain records regarding medical treatment Christopher may have received while at the University of Pittsburgh.  Id.   He did not respond to the request for ImPACT studies and concussion related information.   A November 7, 2012 letter from the University of Pittsburgh Student Health Service stating that it had no medical records related to Christopher

was turned over to Attorney Mendicino on November 19, 2012. Letter from Carole Archer to Mendicino, Nov. 19, 2012, ECF No. 78-6 at 11.

The statement under oath was eventually scheduled for December 10, 2012, as confirmed by Attorney Mendicino. Letter from Mendicino to Tarasi, Nov. 15, 2012, ECF No. 78-6 at 10. When confirming the date for the statement under oath, Attorney Mendicino issued a nonspecific request that Attorney Tarasi "gather the information which I have previously requested." Id. She also included new requests asking for "any and all diagnostic studies" related to the accident or pre-accident, and that she would obtain these records if Christopher would execute authorizations. Id. Attorney Tarasi provided the medical authorizations as asked so that Attorney Mendicino could obtain the diagnostic studies from UPMC Mercy Hospital and UPMC Presbyterian Hospital. Letter from Tarasi to Mendicino, Dec. 12, 2012, ECF No. 78-6 at 12.

The statement under oath of Christopher was taken on December 10, 2012. Tr. Statement Under Oath of Christopher Paul, Dec. 10, 2012, ECF No. 74-4 at 2-40. During this statement Christopher testified that he had used illegal narcotic drugs to address his pain as early as nine or ten months prior to December 10, 2012, which would be as early as February 2012. Id. at 44. Christopher testified that he underwent rehabilitation treatment for Percocet addiction at Glenbeigh AMC Healthcare System in Rock Creek, Ohio, from September 26, 2012, to October 26, 2012. Id. at 55. In addition, he stated that he attended follow-up rehabilitation treatment at a facility in Pittsburgh, Pennsylvania. Id. at 132.

Following the statement under oath, Attorney Mendicino informed Attorney Tarasi that she believed State Farm was missing significant information necessary to evaluate the UIM Claim. Letter from Mendicino to Tarasi, Dec. 13, 2012, ECF No. 74-5. She listed fifteen

24

enumerated items that she claimed would allow her to "be in a position to schedule an

independent medical examination." Id. Attorney Mendicino largely phrased her requests using

general, nonspecific language, and also requested items that Attorney Tarasi had already

provided. Her requests were as follows:

1. All academic, medical, or other records from Fox Chapel High School.
2. All academic, medical, or other records from the University of Pittsburgh.
3. ImPACT studies and diagnostic studies from Dr. Johnson and/or UPMC Sports Concussion program.
4. Diagnostic images from UPMC Mercy conducted on September 12, 2010; and any other studies conducted in the Emergency Room.
5. Any diagnostic studies of Mr. Paul's left knee, right wrist, and/or head injuries.
6. The Lease for the Mary Street apartment.
7. Documentation for the purported UPMC lien, the ERISA language, and right to subrogation.
8. All information in the files of Dr. Weigers, Ph.D.
9. Copy of flyer used by Mr. Paul for his lawn care business.
10. Copy of Mr. Paul's resume.
11. Rehabilitation records regarding treatment at Glenbeigh in Rock Creek, Ohio.
12. Rehabilitation records for follow-up treatment in Pittsburgh
13. Proof of payment for rent at the Mary Street apartment.
14. The name of the person who sold narcotic pain medication to Mr. Paul.
15. Mr. Paul's tax returns from 2007 to the present.

Id.

Attorney Tarasi responded by recounting that generally he had already provided her with

copies of all medical records he had in his possession. Letter from Tarasi to Mendicino, at 2,

Dec. 19, 2012, ECF No. 74-6. Specifically, Attorney Tarasi noted that he had already provided

University of Pittsburgh academic records; the letter from the University's Student Health

Services; authorizations to obtain diagnostic studies from UPMC Mercy Hospital and UPMC

Presbyterian-Shadyside Hospital; documentation for the lien of UPMC Health Plan; and the

initial and amended reports of Dr. Weigers.  Id. at 2-3.  He told her he had already informed her that Christopher has never filed any income tax returns.  Id. at 3.

Attorney Tarasi correctly noted that in her initial extensive discovery requests Attorney Mendicino did not request high school records, diagnostic studies, the lease and proof of rent payment for the Mary Street apartment or Christopher's resume.  Id. at 1.   In fact, this was the first time a request for high school records was made, and Attorney Tarasi said he would try to obtain the records.  Id.

He explained that that he was trying to obtain ImPACT testing and other studies from Dr. Johnson and the UPMC Sports Concussion Program and would provide them upon receipt.  Id. He stated he would contact Dr. Weigers to see if she insisted on only releasing her records to the physician performing the independent medical examination or if she would agree to release them to Attorney Tarasi.  Id. at 2.   He said that he had requested the Glenbeigh treatment records, would acquire follow-up treatment records from the Pittsburgh facility, and would provide all these records when he received them.  Id. at 2-3.

With his December 19, 2012 letter Attorney Tarasi did provide a copy of the lease, noting that he had just obtained it and that Attorney Mendicino had only requested the lease for the first time on October 12, 2012.  Id. at 3.  He stated his position that proof of payment for Christopher's share of the rent at the Mary Street apartment was irrelevant, but that he would try to obtain the records.  Id. at 3.   He noted that Christopher would try to obtain a copy of the lawn care business flyer she requested and had asked Christopher to provide his resume.  Id. at 2.

Attorney Tarasi closed his letter expressing his belief that State Farm was engaging in bad faith tactics as follows:

   I believe you have been dilatory in handing this claim by failing to promptly request the information you have indicated is needed to conduct a "full and fair" evaluation of the claim, by making non-specific requests for information, and by disregarding the information which has already been provided to you.

   I do not believe your pattern of making continual requests for additional information constitutes a good faith effort to effectuate a fair, prompt, and equitable settlement of this claim. I consider your course of conduct to be proof of Bad Faith by State Farm towards its insured, Christopher Paul.

Id. at 3.

  By letter dated February 19, 2013, Attorney Tarasi forwarded to Attorney Mendicino, Dr. Johnson's Office Notes and ImPACT Clinical Reports; a letter from Bill Dorn, M.Div, CAADC, LPC dated January 11, 2013; a letter from Cathy Natalia, BA from Cove Forge Behavioral System dated January 2, 2013; Glenbeigh AMC Healthcare System records dated September 26, 2012 through October 26, 2012; and Christopher's high school transcript, college transcript and additional college records. Letter from Tarasi to Mendicino, Feb. 19, 2013, ECF No. 74-7.

  State Farm encountered some difficulty in having the authorizations for diagnostic studies accepted by medical providers for various reasons, but none of the difficulties was due to Attorney Tarasi failing to cooperate with State Farm. See Letters between Tarasi and Mendicino dated Jan. 28, 2013, Feb.19, 2013, Feb. 21, 2013, Feb. 26, 2013, and Feb. 27, 2013, ECF Nos. 78-6 at 18-19, 74-7, 74-9, 74-10, & 74-11. In the February 26, 2013 letter Attorney Tarasi explained that the medical authorization she asked Christopher to execute was limited to only requesting radiology records, whereas Attorney Mendicino appeared to have submitted a request for records beyond the scope of the authorization. Letter from Tarasi to Mendicino, Feb. 26, 2013, ECF No 74-10. He asked Attorney Mendicino to advise him "exactly what records and/or documents you are now seeking to obtain from UPMC Mercy Hospital." Id.

The final letter sent by Attorney Mendicino is dated February 27, 2013, in which she explains that she seeks "all of the diagnostic studies which were performed upon Christopher Paul from the date of the accident." Letter from Mendicino to Tarasi, Feb. 27, 2013, ECF No. 74-10 at 4. Thereafter, insurance-related activity between the parties ceased for approximately eleven months until Attorney Mendicino's law partner took over active investigation of the UIM claim.

## 2. Christopher's Later Medical Treatment and Drug Use

On March 25, 2011, Christopher was found unconscious at a bar and was transported by ambulance to the emergency room at UPMC Presbyterian Hospital due to alcohol intoxication. City of Pittsburgh EMSC, Mar. 25, 2011, ECF No. 78-16 at 24-29. A drug screen done at the emergency room showed that Christopher did not have any opiates in his system. UPMC Presbyterian Hospital Emergency Room Notes, at 3, Mar. 25, 2011; UPMC Presbyterian Chemistry Urine Drugs results, Mar. 25, 2011, ECF No. 92 at 44 (indicating "Negative" for the presence of drugs including opiates); UPMC Presbyterian Hospital Progress Notes, Mar. 25, 2011, ECF No. 78-14 at 24 (noting that "Tox. screen" was negative except for Alcohol).

As discussed above, the medical evidence shows that Christopher received accident-related medical treatment immediately after the accident through December 2010. The record does not reveal further accident-related treatment until he was seen by Dr. Weigers in November 2011 for an evaluation. He also saw his primary care physician, Dr. Monahan, on January 12, 2012, for ear pain, and complained about headaches occurring two to three times a week and remarked that it was much harder for him to concentrate, focus, and maintain attention at college. Monahan Office Note, Jan. 6, 2012, ECF No. 89 at 14. Dr. Monahan prescribed a trial of Imitrex

to see if it would help with his headaches, discussed post-concussion syndrome with him, and recommended that he follow up with the Concussion Center.  Id.

While vacationing with his family in North Carolina in June 2012, Christopher was transported by ambulance to Brunswick Novant Medical Center.  Brunswick County Emergency Services Record, June 26, 2012, ECF No. 92 at 45-47; Brunswick Novant Medical Center Records, June 26, 2012, ECF No. 109-6.  Christopher reported to emergency responders that he had been using heroin for approximately four months.  Brunswick County Emergency Services Record, at 2, ECF No. 92 at 46.  He stated that he had last used heroin at 8:00 A.M., and started to feel withdrawal symptoms at approximately 9:00 P.M.  Id.   At the hospital, he stated that he wanted to get off heroin but did not want to attend inpatient rehabilitation or detoxification.  Brunswick Novant Medical Center Records, at 3, ECF No. 109-6 at 3.  He was given one dose of oxytocin to help ease withdrawal symptoms and was discharged with several prescriptions.  Id. at 4, 6, ECF No. 109-6 at 4-5.

On July 31, 2012, Christopher was treated by Robert Woolhandler, M.D, for his substance abuse.  Woolhandler Treatment Protocol Note, July 31, 2012, ECF No. 78-17 at 40-42.  Dr. Woolhandler prescribed Suboxone and set a follow-up appointment for August 7, 2012.  Id.  Christopher did not keep the follow-up appointment.  Id.

On September 26, 2012, Christopher voluntarily entered drug rehabilitation treatment for a thirty-day time period at Glenbeigh ACMC Healthcare System in Rock Creek, Ohio.  Glenbeigh ACMC Healthcare System Records, Sept. 26, 2012, through Oct. 26, 2012, ECF Nos. 78-17 at 43-50, 78-18, 78-19, 78-20, & 78-21 at 1-3.  Christopher noted in his Assessment that in March 2012, his girlfriend confronted him about his drug usage.  Glenbeigh Biopsychosocial

Assessment Part 1, at 4, Sept. 27, 2012, ECF No. 78-18 at 26. Christopher reported that his first drug use was at age seventeen, that he had used marijuana "on and off" since age seventeen, and that drugs became a problem for him at age twenty-three. Glenbeigh Biopsychosocial Assessment Part 3, at 2, Sept. 27, 2012, ECF No. 78-18 at 34. He stated that his first use of heroin occurred in March 2012, and that prior to using heroin he had been using Percocet. Id. The counselor interviewing Christopher noted that he "was very minimal on the information he offered." Id. at 4. His admission diagnosis was Opioid dependency with withdrawal. Glenbeigh Admission History and Physical Preliminary Examination, at 1, Sept. 27, 2012, ECF No. 92 at 30. Christopher reported that he experienced chronic pain. Id. at 2, ECF No. 92 at 31.

Upon discharge he was referred to a three-day a week Intensive Outpatient Program at Gateway Allegheny Valley in Pittsburgh, Pennsylvania. Glenbeigh Discharge Plan, at 1, Oct. 26, 2012, ECF No. 78-18 at 9; Glenbeigh Discharge Summary, at 1, Oct. 26, 2012, ECF No. 78-17 at 43. Instead, Christopher and his family chose to attend outpatient treatment at White Deer Run of Pittsburgh, part of the Cove Forge Behavioral Health System. See Valerie Paul Dep. 59, Feb. 6, 2015; White Deer Run/Cove Forge Behavioral Health Systems Record of Service & Progress Notes, Nov. 12, 2012, through March 5, 2013, ECF Nos. 78-21 at 24-50, 78-22 at 1-12. Treatment at White Deer Run consisted of three-hours of intensive outpatient group therapy three evenings per week, followed by a step down to a two-hour outpatient group once a week. At his first group therapy appointment Christopher stated that his drug of choice was opiates, he had used heavily in the last four to five months, and he had gone from pills to heroin in the last two to three months. White Deer Run IOP Outpatient Group Progress Note, Nov. 12, 2012, ECF No.78-22 at 12. The three-night per week program lasted until January 23, 2013, with

Christopher stepping down to the once-a-week program, which he attended four times between January 29, 2013 and March 5, 2013.

On February 5, 2013, Christopher sought treatment for chronic headaches, depression, and anxiety with Timothy H. Wong, M.D., who was a resident under the supervision of Daniel Lapp, M.D.  Wong Office Notes, Feb. 5, 2013, ECF No. 91 at 32-47.  He presented with complaints of "depressed mood, decreased physical endurance, decreased libido and decreased sexual pleasure."  Id. at 1, ECF No. 91 at 32.   Dr. Wong assessed Christopher with depression with anxiety, sexual dysfunction, and traumatic brain injury ("TBI").  Id. at 2, ECF No. 91 at 33.  In addressing his head injury, Dr. Wong stated that Christopher "seems to have mood symptoms, decreased concentration after head injury," and that it may be "either TBI or Post-Concussive Syndrome," but "[g]iven the length of symptoms, I would think this is more moderate TBI."  Id.  Dr. Wong prescribed Zoloft for his depression and asked him to return in 4 weeks.  Id.  at 3-4, ECF No. 91 at 34-35.  Dr. Lapp's notes indicate that he agreed on the diagnoses, assessment, and treatment plan, and noted that Christopher had been addicted to Percocet.  Id. at 3, ECF No. 91 at 34.

Christopher next saw Josif Stakic, M.D., on February 21, 2013, at the Headache Center in Pittsburgh, Pennsylvania, for a headache evaluation.  Stakic Office Visit Note, Feb. 21, 2013, ECF No. 92 at 3-12.  Christopher reported that he currently has approximately twenty headaches per month, with five to ten of the headaches being severe, and that this is the best his headaches have been since the accident.  Id. at 1, 2, 4, ECF No. 92 at 3, 4, 6.  Dr. Stakic noted that Christopher's headaches fit the criteria for a migraine disorder without aura.  Id. at 4, ECF No.

92 at 6.  He prescribed Imitirex, and recommended that Christopher either switch from Zoloft to Effexor, or add another migraine prevention drug.  Id.

On March 5, 2013, White Deer Run records indicate that Christopher called in to say he was not attending that evening's program due to a headache.  White Deer Run Progress Notes, March 5, 2013, ECF No. 78-21 at 24.  He died from the heroin overdose the next day, March 6, 2013.  City of Pittsburgh EMS Record, Mar. 6, 2013, ECF No. 78-16 at 22-23; Autopsy Report, Mar. 7, 2013, ECF Nos. 78-9 at 40-50, 78-10 at 1-4.

### C.  UIM Claim Investigation under Attorney Segmiller

As noted, after Attorney Mendicino's February 27, 2013 letter, insurance-related activity between the parties ceased for approximately eleven months.  Attorney Segmiller, Attorney Mendicino's law partner, took over active investigation of the UIM claim from Attorney Mendicino; the record evidence shows that only Attorney Segmiller continued to correspond with Christopher's counsel.

In the interim, Mr. Grove noted on July 17, 2013, that State Farm's defense attorney informed Mr. Grove that Christopher had recently died from a drug overdose and that the attorney would be sending Mr. Grove a copy of the obituary and another document, but did not have a copy of the coroner's report yet.  Claim File Note, July 17, 2013, 10:50:09 A.M., ECF No. 73-2 at 7.  On November 2, 2013, Mr. Grove entered a note stating that Attorney Mendicino was trying to obtain a coroner's report to confirm the cause and manner of death.  Claim File Note, Nov. 2, 2013, 5:49:55 P.M., ECF No. 73-2 at 7.

Six months later, on January 22, 2014, Attorney Segmiller sent a letter to Attorney Tarasi in which she referred to a prior telephone conversation regarding the state court action and asked

him to provide any other documents he would like State Farm to review in the UIM claim.

Letter from Segmiller to Tarasi, Jan. 22, 2014, ECF No. 78-6 at 25.  Next, Attorney Segmiller

sent Attorney Tarasi a follow-up letter on February 27, 2014, asking for a copy of the police

report or coroner's report regarding Christopher's death.  Letter from Segmiller to Tarasi, Feb.

27, 2014, ECF No. 74-13.  In this letter, she referred to Attorney Tarasi being in the process of

obtaining a medical causation report linking Christopher's death to the automobile accident and

asked for a copy of any report.  Id.

The next activity occurred five months later when Attorney Tarasi provided State Farm

with the medical causation report of Norman V. Kohn, M.D., dated July 22, 2014.  Letter from

Tarasi to Segmiller, July 25, 2014, ECF No. 74-14.  Attorney Tarasi included additional medical

records from Dr. Wong and Dr. Stakic; the autopsy report; and the unredacted treatment records

from Glenbeigh.  Id. at 1.

Dr. Kohn began his report noting that he had reviewed certain specified medical records,

educational records, and criminal docket sheets in addressing the relationship between

Christopher's accident-related injuries and his death.  Report of Norman V. Kohn, at 1, July 22,

2014, ECF No. 105-5 at 2.  Dr. Kohn concluded, in part, that Christopher

> suffered chronic headaches and substantial loss of function due to the traumatic
> head injury that he suffered when he was struck by a car on 09/12/2010.  His
> injuries included concussion with loss of consciousness.  He had a period of
> retrograde amnesia following the incident.  Subsequent neuropsychological
> testing demonstrated deficits consistent with traumatic brain injury.

Id. at 3, ECF No. 105-5 at 4.   He continued his opinion, explaining the effects of the head injury:

> His injury caused headaches that were new, persistent, and severe.  He also
> suffered substantial functional loss with impairment of impulse control,
> organization, working memory, and executive function.  These impacted both his

ability to work and his ability to seek and follow up in medical care. Aware of his
functional loss, he experienced significant depression.

Id. at 3-4, ECF No. 105-5 at 4-5. Dr. Kohn ultimately opined that the accident was a substantial

contributing factor to Christopher's death:

> I find that the traumatic brain injury sustained by Christopher Stanley Paul in the
> motor vehicle accident of 09/12/2010 caused the increase in symptoms
> (headaches and depression) and the changes in judgement and impulse control
> that caused Mr. Paul's drug use and accidental death. The accident of
> 09/12/2010, through the mechanisms outlined above, caused Mr. Paul's
> headaches[,] impulsivity and impaired judgment; and was thereby a substantial
> contributing cause of Mr. Paul's death.

Id. at 4, ECF No. 105-5 at 5.

After receipt of Dr. Kohn's report Attorney Segmiller asked Attorney Tarasi to produce

copies of all the documents Dr. Kohn had listed that he had reviewed (except for the transcript of

Christopher's statement under oath). Letter from Segmiller to Tarasi, July 29, 2014, ECF No.

74-15.

Attorney Tarasi responded to Attorney Segmiller's request by pointing out that all the

listed documents had already been provided to State Farm. Letter from Tarasi to Segmiller, Aug.

4, 2014, ECF No. 74-16. Specifically, he noted that State Farm had been provided with the

following documents on the following dates:

- City of Pittsburgh EMS Report on November 8, 2011 and March 29, 2012;
- UPMC Mercy Hospital Emergency Room records on November 8, 2011 and on March 29, 2012;
- Dr. Monahan's record dated September 16, 2010 on November 8, 2011 and March 29, 2012;
- Dr. Monahan's records dated August 10, 2005 to August 5, 2009, on October 24, 2012;
- Dr. Monahan's record dated January 6, 2012, on July 19, 2012;
- Centers for Rehab Services records on March 29, 2012;
- Dr. Kaufmann's record on November 8, 2011 and on March 29, 2012;
- Dr. Johnson's records dated September 30, 2010 to December 8, 2010 on March 29, 2012,;

- Dr. Johnson's office notes and ImPACT Clinical Reports on February 19, 2013;
- Dr. Weigers' Report on March 29, 2012;
- Glenbeigh treatment records on February 19, 2013 (redacted) and July 25, 2014 (unredacted);
- Letter from Bill Dorn of Isaly Counseling Associates on February 19, 2013;
- Letter from Cathy Natalia of Cove Forge Behavioral Health Systems on February 19, 2013; Dr. Wong and Dr. Stakic records on July 25, 2014;
- Allegheny County Medical Examiner Autopsy report on July 24, 2014;
- University of Pittsburgh transcript on July 19, 2012 and February 19, 2013;
- University of Pittsburgh academic records on February 19, 2013; and
- Fox Chapel Area High School transcript on February 10, 2013.

Id. at 1-3. Attorney Tarasi also noted that Attorney Segmiller is able to obtain docket sheets for any criminal actions against Christopher by using the Unified Judicial System of Pennsylvania Web Portal. Id. at 3.

In light of the fact that Attorney Tarasi had already provided State Farm with the above records, he concluded in the letter that Attorney Segmiller's statement that State Farm had not been provided with any of the records demonstrated bad faith. Id. He stated that he considered her actions, as well as Attorney Mendocino's actions, to be dilatory and in bad faith. Id. Plaintiff filed this lawsuit in state court on September 9, 2014.

On September 29, 2014, apparently in the last correspondence prior to this case being removed to federal court, Attorney Tarasi provided to Attorney Segmiller a copy of the March 6, 2013 City of Pittsburgh Offense/Incident Report regarding Christopher's death. Letter from Tarasi to Segmiller, Sept. 29, 2014, ECF No. 96 at 14. He reiterated that he cannot provide Dr. Weigers' raw neuropsychological data to laypersons, but that Dr. Weigers would provide the records to another physician. Id. Finally, Attorney Tarasi noted that he had requested all records from Glenbeigh and transmitted the records he received to State Farm, first on February 19, 2013 (redacted) and again on July 25, 2014 (unredacted). Id.

As mentioned above, this lawsuit was removed from state court to this court on October 13, 2014, and discovery disputes continued to delay its resolution. An initial case management conference was held on December 18, 2014. On February 4, 2015, Plaintiff filed a motion to compel discovery directed to State Farm. ECF No. 15. Briefing on this motion ended on March 6, 2015, and on March 16, 2015, the court ordered that it would conduct an *in camera* review of all records State Farm claimed were not discoverable due to attorney client privilege and work product doctrine. ECF No. 19. After *in camera* review of the documents the court determined that some of State Farm's documents were protected material, but that certain other material must be turned over to Plaintiff. ECF No. 23.

On May 18, 2015, Plaintiff filed a motion for protective order seeking to bar discovery of the entire files of Plaintiff's counsel, Tarasi & Tarasi P.C. ECF No. 30. Briefing on this motion was completed on June 8, 2015. The next day, June 9, 2015, State Farm filed its own motion for a protective order regarding the in-person deposition of State Farm claims representative Janice Keene. ECF No. 35. Briefing on this motion ended on June 23, 2015.

On July 7, 2015, the court resolved both motions. ECF No. 43. The court denied State Farm's motion regarding the deposition of Ms. Kenee, and set forth parameters for conducting the deposition. Id.

With respect to Plaintiff's motion for a protective order, State Farm sought to obtain the entire case file from Plaintiff's counsel. State Farm argued that Attorney Tarasi waived the attorney client privilege during Christopher's statement under oath. Specifically, State Farm argued that the waiver occurred when Attorney Tarasi indicated in discovery responses that he had advised his client that disclosing the use of illicit drug use might be an admission that he had

36

engaged in criminal activity, but that he had also advised him to disclose that he had undergone rehabilitation treatment for drugs. The court granted Plaintiff's motion insofar as State Farm sought the entire client file. However, recognizing that State Farm's counsel continued to believe that evidence of Christopher's drug use was being withheld, the court ordered Plaintiff's counsel to produce all information related to Christopher's drug use of any type, including records of medical treatment, and any drug or drug related rehabilitation. ECF No. 43 at 12. In its order the court stated that it understood that all relevant drug use and treatment records had already been turned over, but because State Farm persisted in believing other records existed the court entered its order in order to "put to rest the issue of the drug use and treatment of the Decedent." ECF No. 43 at 9.

Ten days after the court entered its July 7, 2015 order, State Farm filed another discovery motion seeking an order to compel medical authorizations to be executed. ECF No. 44. The court granted State Farm's motion without ordering a reply. ECF No. 45.

A few weeks later, the parties again each filed discovery motions within days of each other, which the court resolved in a single order. See Plaintiff's Motion to Compel, ECF No. 46, Aug. 7, 2015; State Farm's Motion to Compel, ECF No. 47, Aug. 11, 2015; and Order, ECF No. 50, Aug. 20, 2015. In this order, the court ordered Plaintiff to produce transmittal letters regarding counsel's efforts to obtain medical records; and "once again order[ed] State Farm to produce any and all documentation referring to communication between counsel on this case." ECF No. 50 at 2.

Finally, Plaintiff filed a motion to compel on September 18, 2015. ECF No. 54. Briefing on this motion was completed on October 1, 2015, and the court resolved the motion on October

16, 2015. In its opinion and order, the court stated that "this case has degenerated into a discovery squabble that does not reflect well on counsel." ECF No. 62 at 1. The briefs addressing this motion indicated that State Farm's counsel handling the UIM claim, Segmiller & Mendicino, P.C., may not have managed the underlying UIM investigation in a careful manner or perhaps failed to communicate or relay documents and information to State Farm or State Farm's counsel handling the instant litigation. The briefs further indicated that Plaintiff's counsel had discovered that certain material that should have been in State Farm's UIM claim file was not, but was contained in Segmiller & Mendicino's UIM claim investigation file.

The parties attended an early neutral evaluation before the Honorable Gary Caruso on February 3, 2015, who reported that the case did not resolve but the parties did "agree that there was no dispute as to liability" (presumably with respect to the accident itself). ECF No. 16. Id. The parties filed a Supplemental Rule 26 Report on December 7, 2015, indicating, in part, that State Farm intends to file a motion to bifurcate the bad faith claim from the UIM/breach of contract claim, but that both cases would be tried before the same fact finder. ECF No. 66, ¶ B. Plaintiff contends that the parties had already previously agreed in its initial Rule 26 Report that both claims would be tried together, while State Farm contends it never agreed not to file a motion to bifurcate. Id.; see Fed.R.Civ.P.26(f) Report of the Parties, ECF No. 10, ¶ 9.e, Dec. 10, 2014 ("Discovery in regard to both the UIM and bad faith claims will be conducted at the same time and both claims will be tried together"). On December 15, 2015, the court issued a scheduling order setting filing dates for motions for summary judgment. ECF No. 69.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).

The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir.1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 322, 325; Marten v. Godwin, 499 F.3d 290, 295 (3d Cir.2007).

Once the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide.

Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex, 477 U.S. at 323–25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Id. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 323–24. The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing decisions); Liberty Lobby, 477 U.S. at 248–49; Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. Liberty Lobby, 477 U.S. at 248.

A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. <u>Celotex</u>, 477 U.S. at 322–23. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. <u>Liberty Lobby</u>, 477 U.S. at 249. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every challenged] element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" <u>Corliss v. Varner</u>, 247 F.App'x 353, 354 (3d Cir.2007) (quoting <u>Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir.2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

IV.     <u>**DISCUSSION**</u>

This case is not about liability under the underlying insurance claim. The parties agree that tort liability rests with the driver who hit Christopher. There is also no dispute that the accident caused Christopher to suffer injuries. When Christopher initiated his UIM claim there was no dispute that he was due some amount of damages for his injuries, but the parties

disagreed about the extent and severity of the injuries. Christopher asserted that he suffered from a traumatic brain injury with long-lasting and severe cognitive impairments that deserved, at a minimum, the liability limits of $400,000.00. State Farm believed Christopher suffered from a serious, but less severe, concussion with post concussive symptoms. Therefore, State Farm initiated its investigation seeking Christopher's complete medical records and wanted to obtain his statement under oath to support its theory that his injuries were not so severe as to justify a payment of $400,000.00. Because the investigation continued through Christopher's death, the nature of the claim altered when Attorney Tarasi notified State Farm about an expert report linking the accident to Christopher's death. As a result, State Farm asserted a defense of concealment and fraud as a complete bar to recovery, thereby taking the position that State Farm had no liability under the Policy.

In his motion for summary judgment, Plaintiff seeks judgment as a matter of law on his bad faith and breach of contract claims. State Farm seeks judgment as a matter of law on its defense that Christopher violated the concealment or fraud provision of the Policy, thereby rendering the Policy void. State Farm also argues that Plaintiff is barred from recovery because Christopher and his counsel failed to timely provide complete records resulting in a violation of the insured's "Duty to Cooperate" provision. State Farm presents a public policy argument that Christopher's use of illegal narcotics should preclude recovery. State Farm argues that the court should decide as a matter of law that the accident was not the proximate cause of Christopher's death. Finally, State Farm argues that Plaintiff failed to establish by clear and convincing evidence that it engaged in bad faith under 42 Pa. Cons. Stat. § 8371.

State Farm's arguments will be considered first because several of its arguments present a complete bar to recovery that would make consideration of Plaintiff's arguments unnecessary. In addition, as argued by Plaintiff, if State Farm is not successful on its claim that material evidence was concealed during the investigation, State Farm's pursuit of its concealment defense serves as evidence in support of Plaintiff's argument that State Farm engaged in a pattern of bad faith conduct.

### A.    Whether Plaintiff Violated the Concealment or Fraud Provision

State Farm seeks to prove that Plaintiff is barred from recovery for violating the Policy's "Concealment or Fraud" provision by concealing and mispresenting his prior drug use and criminal history.   The "Concealment or Fraud" provision appears under the Policy's "General Terms," and provides as follows:

> 11.  **Concealment or Fraud**
>
> There is no coverage under this policy if *you* or any other *person* insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

Insurance Policy, No. 52 0655-A02-38J, General Terms, ¶ 11, at 42, ECF No. 73-1 at 48.

To succeed on its motion for summary judgment State Farm must "demonstrate that no genuine issue of fact exists as to whether [Christopher] either misrepresented or concealed a material fact relating to the insurance contract."  Parasco v. Pacific Indem. Co., 920 F. Supp. 647, 652 (E.D. Pa. 1996).  Plaintiff concedes that Christopher made misrepresentations regarding his drug use and criminal record, and the only concern is with the materiality requirement.  "The question of materiality is generally considered one of fact and law, but if the facts misrepresented are so obviously important that 'reasonable minds cannot differ on the question of materiality,'

43

then the question becomes one of law that the court can decide at the summary judgment stage."

Parasco, 920 F. Supp. at 654, quoting Gould v. Am.-Hawaiian S. S. Co., 535 F.2d 761, 771 (3d

Cir. 1976). "In the context of an insurer's post-loss investigation, 'the materiality requirement is

satisfied if the false statement concerns a subject relevant and germane to the insurer's

investigation as it was then proceeding.'" Parasco, 920 F. Supp. at 654, quoting Fine v.

Bellefonte Underwriters Ins. Co., 725 F.2d 179, 183 (2d Cir. 1984), and citing Long v. Ins. Co.

of N. Am., 670 F.2d 930, 934 (10th Cir.1982) ("a misrepresentation will be considered material

if a reasonable insurance company, in determining its course of action, would attach importance

to the fact misrepresented").

State Farm argues that the misrepresentations are material to State Farm's evaluation of

the UIM claim because Plaintiff claims that Christopher's heroin use and subsequent death from

heroin toxicity are due to the injuries sustained in the September 2010 accident. That is,

Plaintiff explicitly made Christopher's heroin use a part of the UIM claim. However, at the time

the misrepresentations regarding drug use were made Christopher's heroin use was not part of

the UIM claim investigation. Therefore, the misrepresentations could not have been relevant and

germane to the investigation as it was then proceeding.

At the time of the misrepresentation, Christopher's counsel viewed his client's illegal

heroin use as irrelevant to the accident and the insurance claim. Attorney Tarasi advised

Christopher to limit his responses regarding illegal heroin use in order to protect his client from

potential criminal prosecution, not to mislead State Farm or misrepresent material facts. It is not

seriously disputed that the concealment and misrepresentation were not done to defraud State

Farm in order to collect on the claim or to hinder the investigation because neither Christopher

44

nor his counsel had reason to believe it was connected to the UIM claim.[7]  The facts here are

analogous to the misrepresentations found not to be material in the following cases.  Zell v. Fed.

Ins. Co., 2007 WL 1875803 (W.D.Pa. June 27, 2007) (In claim for loss of bracelet, an insured's

misrepresentation about how she had shipped it to another location in order to avoid sales tax

was not material because it was not related to the actual loss of the bracelet, but was related to

the insured's desire to avoid sales tax when she obtained the bracelet); Nationwide Mut. Ins. Co.

v. McKale, 1998 WL 372391 (E.D.Pa. May 27, 1998) (an insured's misrepresentation of

concealing income earned from flea market sales found not material because the purpose of

concealment was to avoid prosecution for what the insured *thought* was illegal income).

Dempsey v. Auto Owners Ins. Co., 717 F.2d 556, 560 (11th Cir. 1983) (an insured, who was

having an affair, lied about where he was in order to avoid disclosing his affair; that

misrepresentation was found not to be material in investigation of fire loss claim).

     The suggestion that Plaintiff was considering pursuing a claim based on linking the

accident to Christopher's heroin use came sometime after Christopher's death, but no later than

February 27, 2014.  See Letter from Segmiller to Tarasi, Feb. 27, 2014, ECF No. 74-13

(referring to Attorney Tarasi seeking a medical causation report linking Christopher's death to

the accident).  There is no evidence that Christopher's counsel intentionally misrepresented or

concealed any material fact about Christopher's drug use or rehabilitation efforts once he

---

[7] Christopher's misrepresentations about his criminal and arrest records after the accident are also not material as any concealment or misrepresentation was not done to defraud State Farm in order to collect on the claim or to hinder the investigation.  Significantly, State Farm always had the ability to access Christopher's criminal records through the Unified Judicial System of Pennsylvania Web Portal.  State Farm also immediately hired Insight Investigations, Inc. on November 21, 2011, to investigate Christopher, and learned by January 6, 2012, that Christopher had been arrested on March 25, 2011, for public drunkenness.  Christopher had no criminal or arrest records prior to the accident that in any way implicate the use of heroin, opioids, or opiates.  His only criminal record prior to the accident is a disorderly conduct charge that is unrelated to the accident or substance abuse.

indicated that he was pursuing a claim linking the accident with heroin use.  Although counsel for both sides engaged in heated discovery disputes throughout this litigation Christopher's counsel turned over relevant records he possessed when asked and provided State Farm with authorizations to obtain medical evidence he did not possess.  Thus, a reasonable fact finder could only find that the record evidence shows that when the misrepresentation was made Christopher's drug use was not "relevant and germane to [State Farm's] investigation as it was then proceeding" insofar as State Farm alleges that Plaintiff had made Christopher's heroin use a part of the UIM claim.  Parasco, 920 F. Supp. at 654.

Even absent Plaintiff's claim linking the accident to Christopher's death State Farm argues that materiality can be demonstrated in another way.   State Farm argues that whether Christopher was using drugs *before* the accident has "a bearing on his decision to quit school for a semester and his ability to find and maintain employment," and that drug use "could be a cause of cognitive problems and headaches," and therefore the misrepresentation was material to the investigation.  Def. Br. in Support, at 26, ECF No. 76 at 26; see also Def. Reply Br. at 6, ECF No. 110 at 6 (questioning whether Mr.  Paul's issues were accident-related or due to drug and alcohol use).

State Farm's argument suffers from being constructed in hindsight; *i.e.*, after State Farm learned about Christopher's drug use and rehabilitation efforts, it appeared to have decided that it was possible that Christopher's drug use, and not the accident, could explain the problems he asserted as the basis for making his UIM claim.  This materiality argument could only be successful if State Farm had been, from the beginning, investigating whether Christopher's drug use, specifically heroin use, was the true cause of his cognitive impairments and decision to

withdraw from college. State Farm, however, faces difficult hurdles to overcome: 1) the evidence shows that Christopher's illegal narcotic use began no earlier than February 2012, which was approximately a year and a half after the accident; 2) overwhelming medical evidence supports the conclusion that it was the accident that caused Christopher's injury and related symptoms, which also drove his decision to withdraw from college for one semester; and 3) State Farm did not conduct its investigation suspecting that drug or alcohol use of any kind was the cause of Christopher's symptoms and led to his withdrawal from college. A reasonable fact finder could only find that neither side suspected that drug use was an aspect of the investigation until Attorney Tarasi sought a medical causation report.

### When Christopher's Heroin Use Began

State Farm argues that the misrepresentations are material because State Farm was denied the ability to conduct an investigation into Christopher's prior drug use before the accident so that it could investigate the effect of drug use as opposed to effects from the accident. This argument is constructed in hindsight and ignores that the evidence shows that Christopher did not engage in heroin or Percocet use prior to the accident. Therefore, no reasonable fact finder could find there was a misrepresentation or concealment about Christopher's pre-accident illegal heroin or narcotic use because no such use occurred.

There is no evidence that Christopher was using heroin or Percocet at any time prior to early 2012. The record evidence supports that Christopher began using heroin around February 2012, and that he may have used Percocet just prior to beginning his heroin use. Tr. Dep. of Valerie Paul, Feb. 6, 2015, at 21, 31, 40, 45-46, ECF No. 78-29 at 21, 31, & 40 & ECF No. 78-30 at 2-3 (Christopher's girlfriend informs Mrs. Paul that she suspects Christopher started using

heroin in March 2012, after first using Percocet); Tr. Statement Under Oath, at 44-46, ECF No.

74-4 at 13-14 (Christopher testifies he started using Percocet approximately nine to ten months

prior to December 10, 2012); Brunswick County Emergency Services record, at 2, ECF No. 78-

17 at 38 (On June 12, 2012, Christopher reported to emergency responders he been using heroin

for approximately four months); Glenbeigh Biopsychosocial Assessment Part 3, at 2, ECF No.

78-18 at 34 (Christopher states his first use of heroin occurred in March 2012, and he had been

using Percocet prior to heroin[8]); White Deer Run IOP Outpatient Group Progress Note, Nov. 12,

2012, ECF No. 78-22 at 12 (Christopher states he had used opiates heavily in the last four to five

months prior to November 2012, and had gone from pills to heroin in the last two to three

months).

### *Evidence of Accident-Related Symptoms*

There is no evidence that Christopher's drug use was the cause of the symptoms he

suffered after the accident or led to his decision to withdraw from school, but there is abundant

evidence demonstrating that the accident led to both his withdrawal from school and his

symptoms. The medical and educational record evidence show that Christopher did not suffer

cognitive problems or headaches prior to the accident. Significantly, the medical evidence

definitively shows that as a result of the accident Christopher suffered a significant head injury,

---

[8] State Farm attached the report of Paul Herman, Ph.D. as an exhibit in support of its reply brief in support of its motion for summary judgment. Paul Herman Report, Sept. 4, 2015, attached as Ex. B to ECF No. 110. In this report, Dr. Herman reviewed numerous relevant documents including Dr. Weigers' November 2011 report, amended in February 2012, and the Glenbeigh rehabilitation treatment records. Herman Report, at 2, ECF No. 110-2 at 2. In discussing Christopher's history, Dr. Herman found it curious that in Dr. Weigers' report there was "no discussion of any drug and alcohol consumption, considering that according to Chris's testimony and information he provided while an inpatient in a substance abuse treatment center, he was self-medicating with Percocet when he was evaluated by Dr. Weigers." Id. at 4. State Farm does not rely on this part of Dr. Herman's report, most likely because, as the court's review of the relevant records demonstrated, there is no evidence Christopher was self-medicating with Percocet in October 2011 when he was evaluated by Dr. Weigers. In short, Dr. Herman's summary of the information Christopher provided is incorrect.

he suffered a concussion, cognitive impairments, and headaches, and he continued to suffer post-concussive symptoms to include cognitive impairment and headaches.  Christopher withdrew from the University of Pittsburgh within weeks after the accident as a result of the injuries and related symptoms.  Thus, there is insufficient evidence from which a reasonable jury could find that Christopher's drug use was a factor in his decision to withdraw from school or was the cause of his cognitive problems and headaches.[9]

### State Farm's Investigation

State Farm did not institute its investigation suspecting that Christopher's prior drug and alcohol use was the true cause of his cognitive impairments and headaches.  State Farm, in fact, conceded that Christopher was injured from the accident and that he suffered a concussion and post concussive symptoms.  It was only later that State Farm argued that drug and alcohol use might have been the cause of Christopher's cognitive impairments, withdrawing from school, and having difficulty obtaining employment.  State Farm's primary evidence to support its after-the-fact argument is based on general, speculative, and conclusory assertions in team manager Robert Mundy's affidavit.   Aff. Robert Mundy, ¶ 18, Jan. 29, 2016, ECF No. 78-1 at 3-4 (whether Christopher was using drugs before the accident "would *certainly have a bearing* on his decision to quit school for a semester and his ability to find and maintain employment;" "drug and alcohol abuse *could be a cause* of cognitive problems and headaches;" and "drug use *could*

---

[9] The court also concludes that the evidence that Christopher had used marijuana minimally prior to the accident, and that he may have used marijuana more extensively after the accident, is not a fact material to State Farm's investigation of the UIM claim as it was then proceeding.   State Farm offers only weak speculation that Christopher's alcohol or drug use of any kind "could be a cause of cognitive problems and headaches."  Def. Br. in Support, at 26, ECF No. 76 at 26; Aff. Robert Mundy, ¶ 18, Jan. 29, 2016, ECF No. 78-1 at 3-4.  Likewise, State Farm can only speculate that perhaps Christopher's marijuana and alcohol use played a role in his decision to drop out of college one week after the accident.

*have a bearing* on his decision to quit school and his ability to find and maintain employment and could have an effect on State Farm's evaluation of the claim").

In contrast, the cases relied upon by State Farm where misrepresentations were found to be material all concern insurance claims arising out of fires where the insurance company initially suspected or had reason to suspect that the insured had a motive to commit arson.  In each of these cases there was a clear and direct line between the insured's misrepresentations or concealment of facts and the insurance company's investigation of the claim.  Sphere Drake Ins. Co. v Zakloul Corp., Civ. No. 96-8123, 1997 WL 312217, at *7 (E.D.PA., June 3, 1997) (Fire Marshal and expert concluded that arson caused fire at issue; insured's misrepresentations regarding their financial conditions and pending lawsuits were material to issue whether insureds had motive to commit arson); Parasco, 920 F.Supp. at 654-655 (investigation revealed that insured-husband had set  fire to insured's house; court found that husband's misrepresentations regarding fact that he had submitted fraudulent tax returns to obtain a loan on the house and that he had tried to sell the house prior to the fire were material misrepresentations going to husband's motive to commit arson); Peer v. Minnesota Mut. Fire & Cas. Co., Civ. No. 93-2338, 1995 WL 141899, at *10 (E.D.Pa. Mar. 27, 1995) (In a claim arising out of a house fire that damaged property within the house, plaintiff's misrepresentations about his financial condition, a judgment against him, and the assignment of his insurance claim were relevant to issue of plaintiff's motive for insurance fraud); Lavin v. Fireman's Ins. Co. of Newark, N.J., Civ. No. 91-0114, 1992 WL 157691, at *3 (E.D.Pa. June 29, 1992) (police and insurance investigator concluded that cause of fire was arson and the plaintiff had repeatedly denied being on property on day of fire, when in fact he had been on the property).

State Farm presented no evidence that it suspected that Christopher was attempting to defraud State Farm in order to collect fraudulently on the claim.[10]  State Farm referred the UIM claim to outside counsel in order to obtain a statement under oath and to determine if an independent medical examination was necessary.  State Farm's position was that the $400,000 policy limit amount requested by counsel to settle the claim was not supported by the medical documentation submitted in November 2011.  See Aff. Robert Mundy, ¶ 9, Jan. 29, 2016, ECF No. 78-1 at 2 ("Because the demand appeared to be disproportionate to the Decedent's injuries and medical treatment, and Decedent's 11 month gap in treatment, the claim was referred to Segmiller & Mendicino, P.C. as part of State Farm's investigation of the UIM claim").  The contemporaneous correspondence from this time shows that Christopher's counsel characterized his client's head injury as a traumatic and permanent brain injury, whereas State Farm viewed the medical evidence as supporting a concussion with post-concussive symptoms; that is, a less severe and less permanent injury.  See Claim File Note, Nov. 21, 2011, 2:32:38 P.M., ECF No. 73-2 at 14-15 (Mr. Grove tells Attorney Tarasi that permanent brain damage "is not supported" by records and that records indicate a concussion with post concussive symptoms).  State Farm's internal records show that it believed that medically-related evidence was time limited and therefore the damages in this case were likely limited to less than what Christopher was

---

[10] State Farm's initial UIM investigation included a question about whether Christopher qualified for coverage under the insurance policy due to his residency status at the time of the accident.  While this was certainly an avenue State Farm was entitled to pursue, it was undertaken in light of overwhelming evidence showing that Christopher did in fact qualify for coverage under the Policy.  In addition, State Farm initially planned to investigate whether Christopher suffered any head injuries from boxing in light of Dr. Monahan's comment that Christopher wanted to continue to box.  If Christopher had engaged in a sport in which he suffered repeated blows to the head State Farm could use such evidence to argue that damages should be less than Plaintiff's demand.  It turns out that there was no evidence that Christopher had ever physically boxed with another person, as opposed to merely engaging in a non-contact boxing workout.  Therefore, just like Christopher could not have concealed heroin use that he was not engaging in prior to 2012, he could not have concealed boxing activity he did not engage in.  In any event, State Farm did not pursue either the residency issue or the boxing issue based on a suspicion that Christopher was concealing or misrepresenting material facts.

requesting. In sum, State Farm assigned an attorney to this case with the belief that this was a case primarily concerning the proper amount of damages.

No reasonable fact finder could find that the misrepresentations in this case are material to State Farm's investigation of Christopher's UIM claim as it was then proceeding. State Farm's motion for summary judgment is therefore denied with respect to whether Plaintiff is barred from recovery based upon the "Concealment or Fraud" provision of the Policy. The court concludes that State Farm's pursuit of the concealment and fraud defense may be considered as conduct supporting Plaintiff's bad faith claim. As discussed below when addressing the parties' bad faith arguments, whether Christopher's later drug and alcohol use was a contributing factor to Christopher's cognitive problems, headaches, and inability to gain employment are arguments to be presented to a fact finder and concern the weight of the evidence when considering damages

### B. Whether the Cooperation Provision was Violated

State Farm's argument that Christopher and his counsel failed to timely provide complete records as requested and that their conduct equates to a violation of the insured's "Duty to Cooperate" provision lacks merit. This insurance case is defined by a lengthy, interactive, and often combative discovery process between State Farm and Plaintiff's counsel dating back to December 2010 when State Farm was first notified of Christopher's UIM claim. No reasonable fact finder considering the record evidence, as discussed above and as addressed below in connection with the bad faith claim, could find that Plaintiff or his counsel failed to cooperate with State Farm's investigation in violation of the Policy's "Cooperation" provision. Therefore, the court will deny State Farm's motion for summary judgment regarding the failure to

cooperate.

### C. Whether Public Policy Should Bar Coverage

State Farm argues that Christopher's injuries resulted from criminal activity involving the use of Percocet and heroin, and therefore public policy should operate to completely bar Plaintiff from recovery.  In its reply brief, State Farm redefines its public policy argument to explain that Plaintiff should only be barred from recovering damages arising out of his illegal drug use (including his death), but that Plaintiff would still be able to recover damages, if any, arising out of the accident, including medical expenses, pain and suffering, and loss of earnings.  Def. Reply, at 8-9, ECF No. 110 at 8-9.

In support of its motion, State Farm cites to a case in which the Pennsylvania Supreme Court stated: "we find that recovery is precluded for damages that arise out of an insured's criminal acts regarding a Schedule I substance, as an overriding public policy."  <u>Minnesota Fire and Casualty Co. v Greenfield</u>, 855 A.2d 854, 866 (Pa. 2004).  In <u>Greenfield</u>, the insured sold heroin to a guest in the insured's home.  The guest used the heroin in the insured's home and died from a heroin overdose.  In rendering its decision in <u>Greenfield</u> the court noted that an insurance policy is not "designed to protect a drug dealer from personal liability for supplying heroin that results in the death of his houseguest."  <u>Id.</u>

The facts in the instant case are distinguishable from the facts in <u>Greenfield</u>.  In <u>Greenfield</u>, the insured sold the heroin that caused the death.  The claim in that case was for the injuries arising directly out of the illegal act of the insured.  Here, the insured is the victim of an automobile accident that caused his injuries.  State Farm admits that the accident caused injuries,

but disagrees about the value of the damage of the injuries. Part of the claim for injuries sustained by Christopher does include a theory that the accident caused a traumatic brain injury that caused pain and cognitive impairment to his judgment that eventually led to his heroin use and ultimate death. The court declines to extend Pennsylvania's public policy bar announced in Greenfield to a case where an insured suffers injuries from an automobile accident, one of which is a claim that the injury proximately caused the insured's later illegal drug use. To accept State Farm's argument in this case is beyond the scope of Greenfield.

**D. Proximate Causation of Insured's Death**

State Farm argues as a matter of law that the automobile accident is not the proximate cause of Christopher's death by accidental heroin overdose. This is a direct legal challenge to Plaintiff's contention supported by an expert medical report linking Christopher's death to the accident. State Farm does not challenge the expert's report and instead argues that recovery is not permitted where there is an extraordinary, independent intervening act that was not reasonably foreseeable by the tortfeasor. Accordingly, State Farm argues that the tortfeasor's duty in this case does not extend to protecting the victim from heroin use as his drug abuse was not a reasonably foreseeable result of the accident.

The court recognizes that Plaintiff's proximate causation theory is novel; however, the case State Farm relies on to support denying Plaintiff the opportunity to present this theory to a fact finder as a matter of law is not analogous to the facts in the present case. Def. Br. in Support, at 35, ECF No. 76 at 35, citing McPeake v. William T. Cannon, Esq., P.C., 553 A.2d 439 (Pa. Super. Ct. 1989). In McPeake, the superior court considered whether to hold a criminal defense attorney responsible for his client's suicide. The client jumped out of the courtroom

window after a jury found him guilty of several offenses. The theory in <u>McPeake</u> was that defense

attorney's negligent trial misrepresentation (and perhaps legal malpractice) proximately caused the death.

In <u>McPeake</u> the court specifically phrased the issue before it as "whether an attorney's duty of representation extends to protecting a client from his own suicidal tendencies." <u>McPeake</u>, 553 A.2d at 441. The superior court noted that "a defendant will not be found to have had a duty to prevent a harm that was not a reasonably foreseeable result of the prior negligent conduct." <u>Id.</u> at 442. The court held "that an attorney's duty to provide adequate representation does not encompass the duty to foresee and protect a client from his own possible suicidal tendencies." <u>Id.</u> at 443.

State Farm analogizes <u>McPeake</u> to this case arguing that the proximate causation issue here is whether the tortfeasor's duty extends to protecting Christopher from the illegal use of narcotics. State Farm's characterization of the proximate causation question in this case is not accurate. Plaintiff does not suggest that the automobile accident directly caused Christopher's later heroin use. Plaintiff claims that the automobile accident caused a severe head injury with symptoms of pain, headache, loss of functioning, and depression that Plaintiff's expert opines resulted in impaired judgment and impulse control that was a substantial contributing cause to Christopher's heroin use and his death. Plaintiff's theory is more in accord with cases allowing compensation in certain cases of suicide cited in <u>McPeake</u> by the court. In McPeake, the court noted that under the workers' compensation statute "compensation will be granted if a suicide

was caused by pain, depression or despair resulting from a work-related injury so severe as to override rational judgment." 553 A.2d 441 (citing <u>Globe Security Sys. Co. v. Workmen's Comp. App. Bd</u>, 520 A.2d 545 (Pa. Commw. Ct. 1987), and <u>SCM Corp. v. Workmen's Comp. App. Bd. (Schulman)</u>, 518 A.2d 887 (Pa. Commw. Ct. 1986). While a fact finder may or may not accept Plaintiff's proximate causation argument, at this stage of the litigation with Plaintiff proffering an expert report providing evidence linking the accident to the death, it is not for the court to decide that proximate causation is absent. Accordingly, the court will deny summary judgment as a matter of law with respect to the issue of proximate causation.

### E. Bad Faith Claim

Both State Farm and Plaintiff seek summary judgment on Plaintiff's bad faith claim. Plaintiff alleges that clear and convincing evidence demonstrates that State Farm acted in bad faith in handling the UIM claim based upon an entire course of alleged dilatory conduct rather than on a particular incident or denial of a claim. The alleged bad faith conduct consists of State Farm 1) initially wrongfully denying Christopher's claim; 2) improperly closing his claim file; 3) misrepresenting the policy's UIM coverage limits; 4) referring Christopher's claim to the SIU unit; 5) filing an affirmative defense alleging fraud with no file documentation or evidence; 6) refusing to propose a settlement offer; and 7) engaging in dilatory and improper conduct its claim representative's and its counsel's handling of the claim. Pl. Motion, ECF No. 70; Pl. Brief in Support, at 12-13, ECF No. 71. State Farm argues that Plaintiff failed to establish that any of the alleged bad faith conduct was unreasonable, much less unreasonable by clear and convincing evidence. Def. Br. in Opp., at 6, ECF No. 84; Def. Br. Support, at 37-42, ECF No. 76.

An insurance bad faith action is governed by Pennsylvania law, 42 Pa. Cons. Stat. § 8371,

which provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> > (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> >
> > (2) Award punitive damages against the insurer.
> >
> > (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. § 8371. The statute does not define "bad faith," or "set forth the manner in which an insured must prove bad faith." Rancosky v. Washington Nat. Ins. Co., 130 A.3d 79, 92 (Pa. Super. Ct. 2015), reargument denied (Feb. 25, 2016), petition for allowance of app. granted, --- A.3d ---, 2016 WL 4530028 (Pa. Aug. 30, 2016) (Mem.). "To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." Condio v Erie Ins. Exch., 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006) (citing Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994); Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)). The Pennsylvania Superior Court has defined bad faith in the insurance context as meaning:

> '[a]ny frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (for example, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.'

Terletsky, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed. 1990)). "Bad faith claims are fact specific and depend on the conduct of the insurer vis à vis the insured." Condio,

899 A.2d at 1143(citing <u>Williams v. Nationwide Mut. Ins. Co.</u>, 750 A.2d 881, 887 (Pa. Super. Ct. 2000)).

The issue whether the insured had a "motive of self-interest or ill will" is the subject of the Pennsylvania Supreme Court's recent grant of a Petition for Allowance of Appeal to address the following issue:

> Whether this Court should ratify the requirements of <u>Terletsky v. Prudential Property & Casualty Insurance Co.</u>, 649 A.2d 680 (Pa. Super. 1994), <u>appeal denied</u>, 659 A.2d 560 (Pa. 1995), for establishing insurer bad faith under 42 Pa.C.S. § 8371, and assuming the answer to be in the affirmative, whether the Superior Court erred in holding that <u>Terletsky</u> factor of a "motive of self-interest or ill-will" is merely a discretionary consideration rather than a mandatory prerequisite to proving bad faith?

<u>Rancosky</u>, --- A.3d ---, ---, 2016 WL 4530028, at *1. The superior court in <u>Rancosky</u> held: "A 'dishonest purpose' or 'motive of self-interest or ill will' is not a third element required for a finding of bad faith" to be added to the traditional two elements of proving by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits, and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim. <u>Rancosky</u>, 130 A.2d at 92.

This court considered this exact issue previously in <u>Employers Mut. Cas. Co. v. Loos</u>, 476 F.Supp.2d 478, 490-91 (W.D.Pa. 2007). In <u>Loos</u>, this court predicted that the Pennsylvania Supreme Court would rule consistently with then-existing superior court holdings that "the 'motive of self-interest or ill will' level of culpability is not a third element required for a finding of bad faith, but is probative of the second element identified in <u>Terletsky</u>, <i>i.e.</i>, "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.". <u>Id.</u> at 491. Pennsylvania case law since this court decided <u>Loos</u> has been consistent with the holding in

<u>Rancosky</u> and therefore the court maintains its prediction of how the Pennsylvania Supreme Court will rule on this issue. While it is possible that the Pennsylvania Supreme Court will set forth new or altered requirements for establishing insurer bad faith, this court again predicts that the Pennsylvania Supreme Court will rule that the "motive of self-interest or ill will" level of culpability is not a third element required for a finding of bad faith, but is probative of the second element identified in <u>Terletsky</u>.

Genuine issues of material fact exist about whether State Farm's conduct constitutes bad faith. There is no doubt that initially State Farm had a reasonable basis to initiate an investigation into Christopher's UIM claim rather than simply meet Plaintiff's policy limits demand. The two sides had a fairly typical difference of opinion about the extent and severity of Christopher's injuries. However, the course of conduct of the investigation raises genuine issues of material fact about whether that conduct had a reasonable basis and whether State Farm knew or recklessly disregarded a lack of reasonable basis. While Plaintiff's identified allegations of instances of bad faith conduct will be discussed, State Farm's overall conduct must be submitted to a fact finder to determine if Plaintiff can show by clear and convincing evidence that State Farm's course of conduct amounts to bad faith.

### 1. Initial Denial of Coverage for Claim

Ms. Kenee was assigned to the claim the day the policy holder, Stanley Paul, called to report that his son was in an accident and to make a claim. Ms. Kenee telephoned Christopher the same day, and Christopher told her that a few weeks prior to the accident he had moved into a rental house with several roommates. Ms. Kenee immediately incorrectly informed Christopher that he would not be covered under the Policy and that he had to turn to the

tortfeasor for any benefits. Not only did she give him the wrong information, she also failed to ask Christopher any follow-up questions to discern if he would be covered under the Policy in some other manner. An insurance representative needs to understand how members of a family might be covered under a policy and to explore obvious alternatives, such as attending college, before perfunctorily denying coverage. One cannot conclude that upon learning that Christopher was not living with his parents Ms. Kenee had a reasonable basis to immediately disqualify him for coverage. At best, she had a reasonable basis to question his coverage status, but she did not do so or investigate his residency; instead, she arrived at an erroneous conclusion.

It cannot be determined as matter of law from the record that she knew or recklessly disregarded the fact that she lacked a reasonable basis or that her conduct amounts to bad faith. Her decision to deny benefits was done in error. Ms. Kenee discovered her mistake within the hour when she called the State Farm agent's office who had issued the Policy, and was immediately informed that Christopher was attending college and that he probably was covered under the Policy. Once she learned about the error she immediately attempted to correct it by telephoning Christopher twice and when he did not return her telephone calls, by mailing a letter. After Christopher's father confirmed to Ms. Kenee that his son was a full-time senior in college, Ms. Kenee recommended on September 21, 2010, that Christopher was qualified for coverage, and medical benefits were paid.

## 2. Improper Closing of Claim File

Plaintiff alleges that State Farm improperly and recklessly closed his claim on December 16, 2010, without first conducting a reasonable investigation. Plaintiff asserts that the claim was closed after Attorney Tarasi advised Ms. Kenee that Christopher was making a claim for UIM

coverage under the State Farm Policy and that the tortfeasor's insurance policy was limited to $15,000. State Farm explained that it closed the MPC claim file on December 16, 2010, the date it received Attorney Tarasi's letter notifying State Farm of his client's UIM claim. The UIM claim was opened on December 21, 2010. State Farm argues that the closing of the unrelated MPC file had no practical effect on Christopher's UIM claim. The court agrees.

In his reply brief, Plaintiff directs attention away from the actual closing of the MPC file and toward a more general argument that State Farm failed to properly investigate and explain contractual benefits to Christopher or his parents in a timely manner. Pl. Reply to Def. Br. Opp. at 10, ECF No. 108 at 10. Plaintiff's argument expands beyond the closure of the MPC claim file to include State Farm's conduct from September 13, 2010, through the time the UIM claim was opened on December 16, 2010. Id. at 10-11.

No reasonable fact finder could find that State Farm's action to close Christopher's MPC claim approximately six weeks after medical benefits were exhausted and only after Christopher asserted a claim for UIM coverage was unreasonable or demonstrated bad faith. Whether the conduct of State Farm's representatives in communicating with Christopher and his parents to explain the Policy during the pendency of the MPC claim is part of a pattern of dilatory conduct that supports bad faith cannot be determined without additional information.

### 3. Misrepresentation of UIM Coverage Limits

After the UIM claim was opened, claims representative Michael Grove incorrectly informed Attorney Tarasi that Christopher "carries UIM Coverage in the amount of $100,000 per person." Letter from Grove to Tarasi, Dec. 22, 2010, ECF No. 73-5. In addition, in Christopher's state court case State Farm filed preliminary objections in which it stated that the

Policy at issue "provided coverage for Underinsured Motorist (UIM) benefits of up to $100,000 subject to the policy's terms, conditions, limitations and exclusions." State Farm Prelim. Obj., at ¶ 6, Sept. 7, 2012.

In fact, the Policy included stacking benefits, which meant that coverage was not limited to $100,000 per person and that benefits were not "up to" $100,000, but that coverage was in the amount of, or up to, $400,000.00. State Farm concedes that it did not correctly state that UIM coverage included stacking benefits in either Mr. Grove's letter or in its preliminary objections. State Farm argues, however, that it did not misrepresent the UIM limits and defends its assertion in several ways.

First, State Farm argues that Mr. Grove's letter is not a misrepresentation because he did not mention stacking and did not state the limits are *not* stacked. Def. Br. Opp. at 9, ECF No. 84 at 9. State Farm also points out that at the time the letter was sent, Mr. Grove did not possess the certified Policy. Id.

Next, State Farm argues that Attorney Tarasi "is a very experienced attorney with abundant experience handling UIM claims." Id. According to State Farm, the mistake made by Mr. Grove was corrected when a certified copy of the Policy was sent to Attorney Tarasi on January 7, 2011. Letter from Grove to Tarasi, Jan. 7, 2011, ECF No. 86-7. The certified Policy reflects that stacking for UIM coverage was available up to $400,000.00. State Farm's implied argument is that even though Mr. Grove inaccurately conveyed the coverage limit, because Attorney Tarasi is an experienced attorney the mistake would be corrected when he received the certified Policy. State Farm points out that Attorney Tarasi referred to the correct Policy limit in his letter of November 8, 2011, when he demanded "the stacked policy limits, which I

62

understand to be $400,000.00, to settle this case." Letter from Tarasi to Grove, Nov. 8, 2011, ECF No. 73-6.

The court disagrees with State Farm's argument insofar as it would absolve State Farm from its obligations accurately to inform an insured of coverage under his Policy. State Farm concedes that Mr. Grove did nothing to correct his error. Merely mailing a certified Policy for Plaintiff's attorney to interpret does not qualify as meeting an insurer's obligation to inform an insured about available coverage under a policy, and definitely does not qualify as correcting a prior written error. State Farm's argument in essence is that its conduct is not bad faith because it did not intentionally conceal the correct policy limits, and that the mistake was mere negligence that ultimately did not have any effect on the UIM claim.

Both parties cite to a case from this district in which bad faith was found based on a pattern of insurer conduct. Wisinski v. Am. Commerce Group, Inc., Civ. No. 07-346 Erie, 2011 WL 13744 (W.D.Pa. Jan. 4, 2011). In Wisinski an insurance representative incorrectly informed the insured that her coverage policy limit was $50,000.00, when in fact her policy included stacking benefits, making the actual coverage limit $100,000.00. The error was not discovered until the insured obtained a new attorney four years later who reviewed the declarations page and discovered that stacking was available and that the coverage limit was higher than reported by the insurance company. Although the insurance company was immediately informed about the stacking benefits, it delayed correcting its error for an additional four months.

In Wisinski, the insurance company similarly argued that it did not intentionally conceal the policy limit from its insured and that it had provided the Declarations page (which showed

stacking benefits) to its insured within approximately six weeks of its error.  In <u>Wisinski</u> the

court rejected that argument, explaining as follows:

> We fail to see how this is significantly different from the insurance adjuster in
> <u>Hollock [v. Erie Ins. Exch.</u>, 842 A. 2d 409 (Pa. Super. Ct. 2004)][[11]] who also
> knew that the insured possessed the policy and presumably the insured could have
> discovered the correct policy limit from that document.  An insurance company's
> duty does not end by merely providing a complete policy to an insured.  In
> <u>Hollock</u> the insurance adjuster always knew the correct policy limit, and failed to
> correct the insured's misunderstanding of the correct limit.  Here, ACIC either
> knew or should have known the correct policy limit, failed to accurately report it
> to the insured, and when confronted with the insured's understanding that  ACIC
> had quoted the wrong policy limit, ACIC held off confirming the correct policy
> limit for nearly four months.

<u>Id.</u> at *14.

Similarly, State Farm knew Plaintiff's counsel possessed the certified Policy and assumed

that he was able to determine the actual coverage limits.  Additionally, no one from State Farm

ever explicitly confirmed that Attorney Tarasi's understanding of the Policy limits was correct,

and that State Farm's initial information was in error.  Nonetheless there are sufficient

differences between this case and <u>Wisinski</u> that require the court to permit a fact finder to

determine whether State Farm's conduct is supportive of bad faith.

In <u>Wisinski</u>, an internal letter confirming that the insured's attorney was correct about the

policy limits included a comment from outside counsel that "unfortunately" coverage could be

stacked.   <u>Id.</u> 2011 WL 13744, at *14.  That letter was not sent until two months after outside

counsel was informed about the correct policy limits.   In addition, the insurance company, who

independently confirmed the stacking benefit, waited another two months before informing the

insured's counsel about the correct limits.

---

[11] In <u>Hollock v. Erie Insurance Exchange</u>, 842 A. 2d 409 (Pa. Super. Ct. 2004), the court found that the insurance
company intentionally misled its insured for over a year regarding the coverage available.

The circumstances in this case are less definitive about State Farm's conduct and underlying intentions. At best, State Farm is correct and a fact finder will only find that it was negligent in incorrectly informing the insured about the policy limit, and that the mistake did not affect the investigation or Christopher's UIM claim. However, a fact finder could also reasonably conclude that State Farm intentionally or recklessly failed to correct its initial mistake and intentionally or recklessly failed to confirm the correct policy limit within a reasonable time. A fact finder may not accept State Farm's argument that mailing the certified Policy equates to a correction of the original error. See Id. at *14 ("An insurance company's duty does not end by merely providing a complete policy to an insured"). Accordingly, the court finds that genuine issues of material fact exist about whether State Farm's conduct in conveying accurate policy limits is evidence of bad faith.

### 4. Referral of Claim to Special Investigations Unit

There is no substance to Plaintiff's allegation of bad faith conduct in State Farm's decision to refer the claim to its Special Investigative Unit. The record evidence supports State Farm's explanation that the referral was made as part of statewide policy to refer any case that included "medical specials" to an investigative unit monitoring for fraud by medical providers. There is no evidence that the referral occurred for any reason connected to State Farm's investigation or handling of the UIM claim, and the referral was "deleted" once investigators apparently determined that none of the medical providers being monitored was involved in this claim.

### 5. Asserting Concealment and Fraud Defense

The court effectively addressed Plaintiff's argument that State Farm asserted a concealment and fraud defense in bad faith in the discussion denying State Farm's motion for summary judgment on this same issue. The court concluded that Christopher's failure to disclose his heroin use and criminal history were not material misrepresentations at the time they were made. Once Plaintiff raised the issue linking the accident to Christopher's drug use and eventual death, Plaintiff did not conceal or misrepresent any information related to the claim. Therefore, a fact finder will have to consider State Farm's pursuit of this defense in determining the issue of bad faith.

The court need not recount herein every single piece of evidence related to the concealment and fraud defense. In reviewing the evidence submitted on the motions for summary judgment the court finds that a fact finder could consider that 1) there is no evidence that Christopher's cognitive impairments and related symptoms were caused by illegal drug use, or that drug use led to his withdrawing from college; 2) there was medical evidence that demonstrated that Christopher suffered an injury from the accident that caused his cognitive impairments and related symptoms, which led to his withdrawal from college; 3) neither Christopher nor his counsel materially misrepresented Christopher's drug use or treatment; and 4) despite the lack of evidence supporting State Farm's theory, it nonetheless aggressively pursued the concealment and fraud defense continually emphasizing that Plaintiff's counsel was withholding relevant medical evidence. Reviewing this evidence, along with other relevant evidence, a reasonable fact finder could conclude that clear and convincing evidence supports a conclusion that State Farm's pursuit of the concealment and fraud defense was unreasonable and done in bad faith.

As previously noted, however, State Farm argued that misrepresenting his drug use was material because State Farm believed that Christopher's pre-accident heroin use could have been 1) the cause of Christopher's cognitive impairment and headaches; 2) the reason why he dropped out of college a few weeks after the accident; and 3) the reason why he had difficulty finding a job.    State Farm's argument as set forth in its briefs does not account for the fact, which the court concluded in this opinion, that Plaintiff did not materially misrepresent his drug use.  Thus, even if State Farm's argument that Christopher's drug use affects the ultimate value of his UIM claim is accepted by a fact finder it would not serve as a reasonable basis on which State Farm asserted its concealment and fraud defense.

State Farm's argument is not based on record evidence, but is instead based on general, speculative, and conclusory assumptions by team manager Robert Mundy.  See, *infra*, Aff. Robert Mundy, ¶ 18, ECF No. 78-1 at 3-4.  As recounted several times, the record evidence demonstrates that prior to the accident Christopher was a successful student who did not suffer from cognitive impairments or headaches.  Shortly after the accident he experienced severe cognitive impairments, frequent headaches, memory loss, and difficulty concentrating.  The evidence supports that the only reason he withdrew from college shortly after the accident was due to the injuries and related symptoms he suffered as a result of the accident.

Similarly, record evidence supports that Christopher did not engage in heroin use until

February 2012 and Percocet use shortly before he turned to heroin.[12]  There are only scattered

hearsay comments that Christopher may have wanted to obtain, could obtain, or might have

obtained illegal narcotics at an earlier time, but there is no definitive evidence to demonstrate he

used illegal narcotics earlier than February 2012.  All other evidence related to drug use by

Christopher prior to his Percocet and heroin use concern unremarkable occasional marijuana use

that is at odds with the record evidence showing that he never suffered cognitive impairments

and headaches prior to the accident.  There are fleeting references reported by third-party

providers that Christopher reported more extensive marijuana use, but there is no corroborating

evidence that would suggest that his marijuana use was remarkable or was a contributing factor

to his cognitive impairments and headaches, his leaving school, or his difficulty in getting a job.

State Farm has no evidentiary basis upon which to argue that Christopher's drug use was

relevant or a contributing factor to the symptoms he experienced after the accident, or that such

use played any part in his decision to withdraw from college.   In sum, the court cannot discern

how State Farm's allegations that Christopher's drug use prior to the accident could be a cause

of, or have a bearing on, his cognitive impairment and headaches, his withdrawal from college,

and his difficulty finding a job, or has anything to do with State Farm's assertion and pursuit of a

concealment and fraud defense.  A reasonable fact finder could conclude that the State Farm

unreasonably asserted a concealment and fraud defense based upon hypothetical prior drug use

---

[12] The court discounts State Farm's argument that it would have been able to obtain relevant evidence if only it had
learned about Christopher's drug use in a timely manner and had Christopher not passed away before they could
seek other evidence from him.  The only information denied to State Farm was the identity of the individual who
sold drugs to Christopher, who was described as a friend of a friend.  It is improbable to believe that an individual
accused of engaging in illegal drug activity would offer evidence to bolster State Farm's hypothesis that
Christopher's drug use began earlier than the accident, much less that this person would voluntarily agree to
incriminate himself under oath.  As discussed in this opinion, the evidence already demonstrates that Christopher did
not use heroin or other drugs prior to the accident, and therefore he could not have concealed or misrepresented a
fact about something he did not do.

and in the face of undisputed medical evidence showing the consequences the accident had on Christopher.

State Farm's argument is related to an evidentiary issue separate from State Farm's assertion of a concealment and fraud defense. Christopher's subsequent drug use is relevant, in a limited manner, to the issue of the proper amount of damages. State Farm may argue that Christopher's later drug use was the cause of, or was a contributing factor to, Christopher's inability to obtain employment. Likewise, State Farm may argue that his drug use exacerbated his cognitive impairments and headaches. However, because there is evidence showing that Christopher's cognitive impairments and headaches were caused by the accident, and that his cognitive impairments and headaches made it more difficult for him to obtain employment, a reasonable fact finder could conclude that the drug use was not a factor that overrode Christopher's existing injuries and symptoms. In light of the above, State Farm's theory that Christopher's drug and alcohol use are contributing factors to his symptoms concerns the weight of the evidence, but is not a reasonable basis for asserting a concealment and fraud defense

### 6. Refusal to Propose Settlement Offer

State Farm never extended a settlement offer to Plaintiff's counsel. The discovery period and investigation of this case has been lengthy, and State Farm argues that it deferred an offer while its investigation was continuing and until all relevant information was obtained. The evidence demonstrates that State Farm agreed that Christopher was injured by the accident and that he did experience concussion and post concussive symptoms. State Farm believed that Christopher's accident-related medical information was time limited, ending in December 2010. Accordingly, State Farm could have proposed a settlement offer in accord with its assessment of

damages based on the medical evidence supporting its theory. As the investigation continued into this lawsuit, State Farm shifted its position in accord with its motion for summary judgment; *i.e.*, State Farm argues that Plaintiff is not entitled to recovery and therefore State Farm has no basis to propose an offer. A reasonable fact finder could view the evidence in this case as supporting State Farm's position, or it could determine that State Farm had more than sufficient information to assess a reasonable value of the claim and to make an offer to Christopher at an earlier point in time in the investigation, but refused to do so. Thus, a reasonable fact finder could determine that State Farm's decision to withhold proposing a settlement offer was unreasonable, done for purposes of delay, and was in bad faith.

### 7. Conduct of State Farm Representatives and Counsel

Plaintiff's primary allegation of bad faith conduct is the continuing course of conduct, some of which is addressed above, by State Farm representatives and its counsel in conducting the investigation, including unreasonably delaying its evaluation of Christopher's claim. Unreasonable delay "functions as the equivalent of a denial" and is "grounds for a bad faith claim." Ania v Allstate Ins.Co., 161 F.Supp.2d 424, 439 n.7 (E.D. Pa. 2001) ("It would be perverse if an insurer could escape bad faith liability by a prolonged and unjustified refusal to approve or deny an insured's claim . . . .").

Plaintiff argues that State Farm should have been able to begin a prompt, fair, and equitable evaluation of Christopher's claim as of Attorney Tarasi's November 8, 2011 demand letter. At that time, Plaintiff alleges that State Farm had sufficient information regarding Christopher's injuries and resulting symptoms and impact on his life, as well as supporting medical records and medical reports. In addition, as the court has already noted, State Farm had

internally concluded that Christopher's injuries were limited to a time frame ending around December 2010. Plaintiff argues that instead of conducting a prompt and equitable evaluation of the objective evidence, State Farm engaged in speculation about what evidence was necessary in order to evade its responsibility.

State Farm's conduct in this case is suggestive of bad faith. The investigation appears to have been unreasonably extended in comparison to State Farm's initial assessment that the focus of the UIM claim was the proper amount of damages for medically-related injuries caused by the accident. In addition, State Farm's lead counsel, Attorney Mendicino, initially served extensive formal interrogatories and requests for production of documents, but in her letter transmitting the discovery requests she also asked for material that differed slightly from and was not contained within the discovery requests. She also consistently made general nonspecific requests for discovery, persisted in requesting material that she had already asked for and received, and insisted on being provided with trivial or irrelevant material before setting an independent medical examination. For example, in December 2012, she informed Attorney Tarasi that she would not schedule an independent medical examination until she received a copy of the lease and cancelled checks indicating payment of rent; Christopher's lawn care business flyers, his resume, and his tax returns; and the names of individuals who sold drugs to Christopher. There is no reasonable basis to conclude that this material was needed before an independent medical examination was conducted, and instead suggests that Attorney Mendicino was unreasonably delaying the investigation.

Attorney Mendicino and State Farm appeared to place an undue emphasis on less significant material in an effort to accuse Attorney Tarasi of not being fully cooperative or

otherwise trying to stonewall State Farm. For example, State Farm and Attorney Mendicino had discussed internally requesting a copy of Christopher's lease in December 2011, but Attorney Mendicino failed to submit a request for a copy of the lease in her initial formal discovery requests or in her letter transmitting her discovery requests. After Attorney Tarasi responded to the discovery requests, she reported to Mr. Grove that no lease was included in the discovery responses, indicating that she was unaware that she had not asked for a copy of the lease. She remained unaware that she had not requested a copy of the lease as late as October 2012, when she incorrectly stated to Attorney Tarasi that she "had requested all of the lease documents with regard to Christopher's apartment in the Southside during the term of that lease." Letter from Mendicino to Tarasi, Oct. 31, 2012, ECF No. 74-3.

State Farm's counsel's emphasis on the lease is "less significant material" because more likely than not State Farm knew that Christopher was covered under the Policy. State Farm had already previously approved Christopher for MPC coverage under the Policy. Certainly due diligence required that State Farm obtain documentation to confirm what was obvious, but perhaps undocumented; however, a fact finder could reasonably believe that State Farm's emphasis on obtaining a copy of the lease years after the accident and after it had initially failed to request the lease was solely for purposes of harassment and delay.

After almost two years of managing the investigation, State Farm's lead attorney, Attorney Mendicino ceased communicating with Attorney Tarasi, and her partner, Attorney Segmiller, took over. Again, the record evidence of Attorney Segmiller's active management of the investigation is suggestive of conduct amounting to unreasonable delay. It is difficult to review the record evidence and not conclude that Attorney Segmiller, Attorney Mendicino, and

several State Farm representatives were either negligently managing the investigation or simply failing to communicate properly amongst themselves. The evidence does not allow for a concrete answer as a matter of law. However, the correspondence strongly suggests that 1) Attorney Segmiller did not completely familiarize herself with the progress of the investigation and did not properly review the historical correspondence and documents that had already been provided; or 2) there was a lack of communication and failure to share records within the law firm or between the law firm and State Farm. As the court's review of the relevant correspondence showed, Attorney Segmiller continued to request documents that had already been provided, sometimes more than once. A reasonable fact finder could find by clear and convincing evidence that the course of conduct of State Farm and its counsel was in bad faith.

Attorney Tarasi is not completely absolved. There were times too that his responses to requests were delayed. At other times he did not provide every item State Farm requested, and did not refer to the missing material to explain why he had not provided it. However, Attorney Tarasi's conduct cannot be deemed to be willful non-cooperation or characterized as done in a manner so as to frustrate State Farm's investigation. A review of the evidence shows that Attorney Tarasi typically complied with State Farm's requests, usually with a comprehensive response directly addressing each request. His omissions were not indicative of dilatory conduct, and perhaps were more fatigue in the face of State Farm's conduct. For example, he failed to explain in his initial discovery responses that Christopher's prior medical records were not included because they were in storage and he had not received them yet. He eventually provided the records when he received them. He specifically explained to State Farm his reasoning about why he did not think ImPACT testing and other underlying testing could be released to the

attorneys, believing that it was proprietary and could only be released to a medical professional. Regardless of the correctness of his position, Attorney Tarasi did not stand to gain any advantage as he had already turned over the medical reports based on the test results and he fully expected that State Farm's medical expert would eventually review the materials. The evidence supports that Attorney Tarasi provided medical records he possessed, sought to acquire records he did not possess, and provided authorizations for State Farm to obtain records.

State Farm points to Attorney Tarasi initially providing redacted records with respect to Christopher's Glenbeigh rehabilitation records as evidence of noncooperation, concealment, and delay. However, his decision to redact references to heroin from these records is in accord with his then-belief that Christopher's heroin use was unrelated to the insurance claim, not relevant, and potentially criminally damaging to Christopher. State Farm attempts to divert attention away from its failure to realize the records were redacted, despite a cover page indicating the same, ECF No. 74-8, by complaining that the redactions were done with white tape. However, the redacted records did reference Christopher's Percocet, opiate, and opioid use. In any event, once the issue of Christopher's heroin use was made a part of his UIM claim, Attorney Tarasi provided the unredacted records.

The court agrees with Plaintiff that a reasonable fact finder could find by clear and convincing evidence that the course of conduct of State Farm and its counsel demonstrated unreasonable delay, negligence or recklessness, and perhaps amounts to bad faith. Genuine issues of material fact, however, exist that preclude entry of summary judgment as a matter of law. A key factor in this case is that State Farm could have conducted a prompt, fair, and reasonable investigation of the UIM claim based on objective medical evidence it had received in

74

November 2011 in light of the fact that liability was clear and that Christopher was injured as a result of the accident. State Farm disagreed that Christopher's injuries were as extensive as claimed in light of the medical records documenting Christopher's treatment. The medical evidence State Farm had in its possession as of November 2011 reasonably supports a conclusion that Christopher's injuries were essentially resolved but that he did continue to suffer post concussive symptoms. Rather than conduct an investigation based that conclusion and promptly proposing a settlement offer, State Farm's conduct could be seen by a fact finder as clear and convincing evidence of purposeful and unreasonable delay designed to frustrate Christopher's attempts to finalize his claim.

It will be State Farm's burden to persuade a fact finder that its decision to not offer a settlement proposal based on the evidence of record was reasonable. Similarly, State Farm will have to persuade a fact finder that its pursuit of an aggressive and expansive investigation was reasonable and not done for purposes of delay or to avoid making payment on Christopher's claim. State Farm's argument that it acted reasonably depends in large part on its ability to convince a fact finder that once State Farm discovered that Christopher had used illegal drugs and attended drug rehabilitation treatment it was reasonable for State Farm to shift its investigation from examining the extent and severity of Christopher's accident-related injuries to pursue an aggressive strategy based on the theory that Christopher's medically-supported accident-related injuries and symptoms were actually caused by drug use. At best, there are genuine issues of material fact that must be presented to a fact finder to decide this issue. In turn, Plaintiff's burden will be to persuade a fact finder that Christopher's accident-related injuries and related symptoms were not time limited and that his later drug and alcohol use did

not substantially affect his accident-related difficulties.  Plaintiff will also face the difficult task of persuading a fact finder to accept a novel theory of proximate causation linking the accident to his later heroin use and eventual death.  Accordingly, the court will deny both parties' motions for summary judgment with respect to Plaintiff's bad faith claim.

### F.  Breach of Contract

Plaintiff asserts that State Farm breached its fiduciary, contractual, and statutory obligations under the Policy by failing to reasonably investigate, evaluate, negotiate, and offer payment.  Plaintiff's allegations are based upon the facts underlying the bad faith claim. Because the court determined that genuine issues of material fact exist precluding judgment as a matter of law with respect to Plaintiff's bad faith claim, summary judgment with respect to the breach of contract claim is also precluded.

## V.   CONCLUSION

State Farm failed to establish as a matter of law that Plaintiff violated the concealment and fraud provision of the Policy as the evidence shows that there were no material misrepresentations.   The court rejected State Farm's remaining arguments for summary judgment.  Plaintiff presented evidence from which a fact finder could reasonably conclude by clear and convincing evidence that State Farm's conduct amounts to bad faith in violation of 42 Pa. Cons. Stat. § 8371.  In contrast, State Farm did not establish that its conduct was reasonable as a matter of law and this issue, as well as whether State Farm breached the contract, must be presented to a fact finder.  For the foregoing reasons, both State Farm's motion for summary

judgment and plaintiff's motion for summary judgment will be denied.

An appropriate order follows.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated:  September 28, 2016